1  WALTER F. BROWN (STATE BAR NO. 130248)
   wbrown@orrick.com
2  MELINDA HAAG (STATE BAR NO. 132612)
   mhaag@orrick.com
3  RANDY LUSKEY (STATE BAR NO. 240915)
   rluskey@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
5  405 Howard Street
   San Francisco, CA  94105-2669
6  Telephone:     +1 415 773 5700
   Facsimile:     +1 415 773 5759
7
   Attorneys for Defendant
8  Katherine Mogal

9
                    UNITED STATES DISTRICT COURT
10
                   NORTHERN DISTRICT OF CALIFORNIA
11
                        SAN JOSE DIVISION
12

13
   United States of America,              Case No. CR-18-259 (BLF)
14
                    Plaintiff,            **DEFENDANT'S OPPOSITION TO**
15                                         **UNITED STATES' MOTION TO**
                                           **DISQUALIFY RANDALL LUSKEY,**
16        v.                               **ESQ. AND ORRICK, HERRINGTON &**
                                           **SUTCLIFFE, L.L.P. AS COUNSEL**
16  Katherine Mogal, et. al.,
17
                    Defendants.
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................... 3

III.    MS. MOGAL HAS A STRONG CONSTITUTIONAL RIGHT TO CHOOSE
        HER COUNSEL .................................................................................................... 6

IV.     THE GOVERNMENT'S SPECULATIVE AND REMOTE POTENTIAL
        CONFLICTS ARE NOT SUFFICIENT TO DEPRIVE MS. MOGAL OF HER
        CONSTITUTIONAL RIGHT TO CHOOSE HER COUNSEL ........................ 7

        A.     Ms. Mogal obtained independent advice and knowingly and intelligently
               waived any potential conflict .................................................................. 8

        B.     Ms. Mogal's co-defendants knowingly and intelligently waived any
               potential conflict after independent advice ........................................... 10

        C.     Defendants' waivers satisfy the applicable ethical rules ...................... 11

        D.     There is no reason to set the valid waivers aside .................................. 12

               1.     There is no actual or serious potential for conflict between
                      Defendants ................................................................................... 12

               2.     There is no actual or serious potential for conflict between Ms.
                      Mogal and Fitbit .......................................................................... 16

V.      CONCLUSION ................................................................................................. 17

4155-0039-4774.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*,
    264 F. Supp. 2d 914 (N.D. Cal. 2003) ........................................................................15

*In re County of Los Angeles*,
    223 F.3d 990 (9th Cir. 2000)................................................................................11

*Cuyler v. Sullivan*,
    446 U.S. 335 (1980) .........................................................................................12

*Garcia v. Bunnell*,
    33 F.3d 1193 (9th Cir. 1994).............................................................................7, 8

*Jacobus v. Krambo Corp.*,
    78 Cal. App. 4th 1096 (2000).............................................................................16

*Karwasky v. Zachay*,
    146 Cal. App. 3d 679 (1983)..............................................................................16

*Kasza v. Browner*,
    133 F.3d 1159 (9th Cir. 1998), *cert. denied*, 525 U.S. 967 (1998) ............................2

*In re Marvel*,
    251 B.R. 869 (Bankr. N.D. Cal. 2000), *aff'd* 265 B.R. 605 (N.D. Cal. 2001).....................2, 6

*Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*,
    760 F.2d 1045 (9th Cir. 1985).............................................................................6

*Powell v. Alabama*,
    287 U.S. 45 (1932) ...........................................................................................6

*SEC v. Tang*,
    831 F. Supp. 2d 1130 (N.D. Cal. 2011) ....................................................11, 15, 16

*Skyy Spirits, LLC v. Rubyy, LLC*,
    2009 U.S. Dist. LEXIS 109641 (N.D. Cal. Nov. 9, 2009).......................................12

*United States v. Cunningham*,
    672 F.2d 1064 (2d Cir. 1982).............................................................................11

*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006) ......................................................................................1, 6

4155-0039-4774.1

*United States v. Kliti,*
    156 F.3d 150 (2d. Cir. 1998)..................................................................7

*United States v. Lightbourne,*
    104 F.3d 1172 (9th Cir. 1997).................................................................8

*United States v. Martinez,*
    143 F.3d 1266 (9th Cir. 1998).........................................................1, 2, 7, 12

*United States v. Partin,*
    601 F.2d 1000 (9th Cir. 1979).................................................................8

*United States v. Perez,*
    325 F.3d 115 (2d. Cir. 2003)..........................................................7, 8, 16

*United States v. Rewald,*
    889 F.2d 836 (9th Cir. 1989)...................................................................13

*United States v. Turner,*
    594 F.3d 946 (7th Cir. 2010)...............................................................14, 15

*Visa U.S.A., Inc. v. First Data Corp.,*
    241 F. Supp. 2d 1100 (N.D. Cal. 2003) ..................................... *passim*

*Wheat v. United States,*
    486 U.S. 153 (1988) ....................................................................... *passim*

**Statutes**

18 U.S.C. § 1832(a)(3)............................................................................5, 13

18 U.S.C. § 1832(a)(5)............................................................................5, 13

19 U.S.C. § 1337 ...........................................................................................3

California Labor Code § 2802(a) ..........................................................16

**Other Authorities**

Federal Rule of Criminal Procedure 44 .............................................15

California Rule of Professional Conduct 3-310 ...............................12

California Rule of Professional Conduct 3-310(F) ...........................9

Sixth Amendment ..................................................................6, 7, 17

OPPOSITION TO MOTION TO
DISQUALIFY
CR-18-259 (BLF)

4155-0039-4774.1

## I.    **INTRODUCTION**

This case involves an audio engineer, an accounting manager, a director of customer experience, a mechanical engineer, a user researcher, and a product manager (collectively, "Defendants"), all of whom at different times left Jawbone—a fledgling technology company that is now out of business—to work for Fitbit—the leading developer of wearable fitness-tracking devices that became a publicly traded company on June 17, 2015.  Since joining Fitbit, Jawbone has engaged in a three-year campaign against these six individuals, suing them for trade secret misappropriation in a state court civil action that resolved in 2017, and bringing nearly identical claims in an action before the International Trade Commission ("ITC") that concluded with the ITC's complete rejection of the allegations.  The instant Indictment against these same individuals followed.

After over three years of litigation involving lengthy depositions, witness statements, and live trial testimony from *each* of the six Defendants, no defense lawyer who has looked at the evidentiary record in this case has ever identified an actual or a potential conflict of interest between *any* of these six individuals.  Only two of the individuals ever worked together, and the Indictment contains *no* allegation that any of the Defendants conspired or acted together to steal trade secrets.

Notwithstanding the lack of an actual conflict, the United States (the "government") asks the Court to deprive Defendant Katherine Mogal of her strong constitutional right to be represented by counsel of her choosing, *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006), because of hypothetical *potential* conflicts that might arise between her and the other Defendants or between her and Fitbit.  Where the government seeks to disqualify a law firm based solely on potential conflicts of interest, the Court has two primary issues to decide: (1) whether there has been a *knowing* and *intelligent* waiver of the potential conflict; and (2) if so, whether the potential conflict is waivable in the first instance.  *United States v. Martinez*, 143 F.3d 1266, 1270 (9th Cir. 1998).  The answer to both questions here is resoundingly "yes."

*First*, it is undisputed that Ms. Mogal and each of the other Defendants has knowingly,

intelligently, and repeatedly waived the potential conflicts identified by the government. The most recent waivers, attached hereto as Exhibits A-F to the Declaration of James Thompson ("Thompson Decl."), set forth that each of the Defendants fully appreciate the possibility of potential conflicts of interest (including those described in the government's Motion to Disqualify ("Motion")), have discussed those potential conflicts with independent legal counsel, and have consented to Orrick's continued representation of Ms. Mogal. *Id.* Indeed, the fact that Defendants have not sought disqualification strongly weighs against the government's Motion. *Kasza v. Browner,* 133 F.3d 1159, 1171 (9th Cir. 1998), *cert. denied,* 525 U.S. 967 (1998).

*Second*, the speculative and remote potential conflicts alleged here clearly are waivable. Conflicts are waivable "unless they are so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation." *Martinez*, 143 F.3d at 1270 (citation omitted). That is not the case here. The possibility that the government might ask a Defendant to cooperate in the government's investigation, without more, is not enough to create a serious potential conflict of interest vis-à-vis the other Defendants, especially between Defendants that did not even work together. And though Ms. Mogal and Ana Rosario worked in the same department, the government has been unable to articulate any reason why that fact alone creates potential adversity, and their prior testimony confirms that none exists. Indeed, all six Defendants testified in the ITC action, under oath, that they had not misappropriated any trade secrets, and that they lacked any reason to do so. None of them tried to shift blame – rather, they denied the allegations outright. Finally, the government's concern about a potential conflict between Ms. Mogal and unnamed, hypothetical Fitbit witnesses is similarly far-fetched and speculative.

The Court should not take the "drastic measure" of depriving Ms. Mogal of her fundamental right to be represented by counsel of her choosing. *See Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1103-04 (N.D. Cal. 2003)(Hamilton, J.) (disqualification is considered a "drastic measure" and is imposed only when absolutely necessary), *quoting In re Marvel*, 251 B.R. 869, 871 (Bankr. N.D. Cal. 2000), *aff'd* 265 B.R. 605 (N.D. Cal. 2001)). Instead, if the Court has additional questions that it feels are not answered by the existing waiver

letters, the Court should discuss them with Ms. Mogal (who will be present at the hearing).

## II.    **STATEMENT OF FACTS**

Orrick was retained in May of 2015 to represent Fitbit and the Defendants in a civil action brought against them by Jawbone ("State Court action").[1]  Thompson Decl. ¶ 7.  In that action, Jawbone alleged that the Defendants misappropriated the same trade secrets alleged here, as well as several others.  Thompson Decl., Ex. G.  Shortly thereafter, Jawbone filed another action against Fitbit before the ITC ("ITC action"), alleging nearly identical trade secret claims as those raised in the State Court action (and here), again based upon Defendants' alleged conduct. Thompson Decl., Ex. H at 19-27.  Gibson, Dunn & Crutcher LLP ("Gibson") represented Fitbit in the ITC action, and Orrick represented the individual Defendants as witnesses in the ITC action. Thompson Decl. ¶ 10.

The ITC action was heard in May of 2016 before an Administrative Law Judge ("ALJ"). Each of the Defendants testified live at the hearing, under oath, and was cross examined by Jawbone's counsel.  *See* Thompson Decl. ¶ 11.  Each of the six Defendants separately testified that they: (1) did not intentionally take any trade secrets from Jawbone and never used any of the alleged trade secrets after starting work at Fitbit, and (2) had no reason to do so because the purported trade secrets would not have been useful at Fitbit given the drastic differences between the two companies and the Defendants' individual roles therein.  Thompson Decl. ¶ 12.  None of the Defendants tried to shift the blame; rather, they denied culpability altogether.  *Id*.  After a two-week trial, the ALJ prepared a lengthy written opinion in which she found no evidence that anyone had misappropriated any trade secrets in violation of 19 U.S.C. Section 1337.  Thompson Decl., Ex. I.  The ITC made this decision final on October 20, 2016.  Thompson Decl., Ex. J.

The Defendants first learned of the government's criminal investigation on August 12, 2016, when Jawbone's counsel notified Orrick.  Thompson Decl. ¶ 15, Ex. K.  On November 16, 2016, Gibson and Orrick met with the government to discuss the criminal investigation. Thompson Decl. ¶ 16.  At that meeting, Orrick also discussed the potential conflicts issues and

---

[1]    Defendant Weiden was not initially a defendant in the State Court action, but was subsequently added in 2016.

OPPOSITION TO MOTION TO
DISQUALIFY
CR-18-259 (BLF)

4155-0039-4774.1

1   informed the government that it had obtained waivers from each of the individual Defendants.  *Id.*

2   These waivers were reflected in Defendants' initial engagement letters with Orrick, executed in

3   June of 2015.[2]  Thompson Decl., Exs. L-Q.

4          On May 22, 2017, the government informed Orrick that it "consider[ed] at least two of the

5   individuals to be Targets of the Grand Jury Investigation" (although it did not identify which

6   individuals) and indicated that the conflicts issue had "ripened."  *See* Docket No. 23, Rooney

7   Decl. Ex. 1.  Orrick promptly provided a copy of this letter to the individual Defendants and

8   engaged in lengthy discussions with each of them regarding potential conflicts, the risks to them,

9   and answered any questions.  Thompson Decl. ¶ 23.  Following these discussions, the Defendants

10  each agreed to "waive any actual or potential conflict" stemming from this development,

11  including any conflict based upon Fitbit's advancement of fees and costs to represent them.

12  Thompson Decl., Exs. R-V.[3]  Orrick mentioned these conflict waivers to the government on

13  numerous occasions and indicated that, based upon the facts it was aware of, and extensive

14  conversations with its clients, it did not believe there were any actual or potential conflicts among

15  them.  Thompson Decl. ¶ 29.

16         For over a year, Orrick pressed the government to identify any actual or potential

17  adversity between these six individuals or Fitbit.  *Id.*  The government consistently refused to

18  articulate any actual or potential conflicts, other than noting that Ms. Mogal and Ms. Rosario

19  worked in the same department at Jawbone and Fitbit.  *Id.*  In response to the government's only

20  articulated concern, Orrick sent the government an email on December 21, 2017, stating that it

21  continued to "see no actual conflicts between our clients" but that it would consider finding

22  separate counsel for the "only individual where we can see why ***you might perceive a potential***

23  ***conflict***: Ana Rosario."  *Id.*, Ex. W (emphasis added).

24         On January 26, 2018, Orrick met with the government to discuss the criminal

25  investigation.  Thompson Decl. ¶ 30.  As part of that meeting, Orrick again informed the

26  _____
    [2]    Orrick did not begin representing Gee Weiden until June 22, 2016 as she was not initially named as a defendant
27  in the State Court Action.

    [3]    Ana Rosario did not execute a waiver letter in June 2017, but subsequently did so in 2018.
28

OPPOSITION TO MOTION TO
DISQUALIFY
CR-18-259 (BLF)

4155-0039-4774.1

government that it continued to see no conflicts between any of these six individuals but that, in an abundance of caution, Ms. Rosario could engage her own lawyer to resolve the government's only perceived conflict if that would allow the investigation to move forward and finally give the individuals an opportunity to demonstrate their innocence. *Id.* Orrick asked the government to let Orrick know if Ms. Rosario should proceed to hire separate counsel. *Id.* Orrick never heard back from the government until the Indictment was returned approximately five months later. *Id.*

The Indictment charges each of the Defendants solely with possession of trade secrets with the intent to injure Jawbone, in violation of Title 18 U.S.C. § 1832(a)(3). *See* Docket No. 1. The Indictment does not include conspiracy charges under 18 U.S.C. § 1832(a)(5) and does not otherwise allege that any of the Defendants conspired with one another or with Fitbit to steal trade secrets from Jawbone, or otherwise acted in concert. The Indictment similarly does not allege that any of the six Defendants were recruited together by Fitbit. Nor does the Indictment allege that the Defendants knew each other or worked directly with one another at either Fitbit or Jawbone. Nor does it allege that the Defendants used or otherwise disclosed any trade secrets while at Fitbit.

Following the Indictment, each of Ms. Mogal's co-defendants retained separate counsel to represent them in the criminal case. Thompson Decl. ¶ 31. Thereafter, and upon the advice of their new independent counsel, each of the co-defendants executed knowing and intelligent waivers indicating that they did "not object in any way to Orrick's continued representation of Katherine Mogal in connection with the Indictment, and to the extent that any actual or potential conflict may exist or appears to exist, [they] agree[d] to waive any such conflict." *Id.*, Exs. B-F. Moreover, each agreed "that in the case that any Individual Defendant becomes a witness, nothing related to Orrick's joint representation in the Prior Matters shall create a conflict of interest so as to require the disqualification of Orrick in its representation of Katherine Mogal." *Id.* Finally, they agreed that "Orrick, while honoring and adhering to the attorney-client privilege, will not be disqualified from examining or cross-examining any Individual Defendant because of its joint representation in the Prior Matters." *Id.*

Ms. Mogal also executed a refreshed waiver following the Indictment. Thompson Decl., Ex. A. She did so after speaking with independent legal counsel – Miranda Kane (the former Criminal Division Chief for the United States Attorney's Office in the Northern District of California) – who met with her, answered her questions, and advised Ms. Mogal extensively about the conflict of interest issues. Thompson Decl. ¶ 32. This refreshed waiver set forth each of the potential conflicts raised by the government in its Motion (as well as several others), and Ms. Mogal agreed to waive these conflicts, but also agreed that if either Orrick or Ms. Mogal became aware of any new actual or potential conflicts, that they would discuss and determine whether Orrick's continued representation was appropriate at that time. *Id.,* Ex. A.

### III.   MS. MOGAL HAS A STRONG CONSTITUTIONAL RIGHT TO CHOOSE HER COUNSEL.

The Sixth Amendment right to counsel includes a criminal defendant's right to retain counsel of her own choosing. *Gonzalez-Lopez*, 548 U.S. at 147-48; *see also Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of [her] own choice."). Although disqualification of counsel is within the trial court's discretion, it is considered a "drastic measure" and "is strongly disfavored." *See e.g.*, *Visa*, 241 F.Supp. 2d at 1104 ("A motion for disqualification of counsel is a drastic measure which courts should hesitate to impose except when of absolute necessity. They are often tactically motivated; they tend to derail the efficient progress of litigation.") *quoting In re Marvel*, 251 B.R. at 871. Accordingly, the "District Court must recognize a presumption in favor of [the defendant's] counsel of choice," and requests for disqualification "should be subjected to ***particularly strict judicial scrutiny***." *Wheat v. United States*, 486 U.S. 153, 164 (1988); *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1050 (9th Cir. 1985) (emphasis added) (citation omitted).

4155-0039-4774.1

**IV.    THE GOVERNMENT'S SPECULATIVE AND REMOTE POTENTIAL
CONFLICTS ARE NOT SUFFICIENT TO DEPRIVE MS. MOGAL OF HER
CONSTITUTIONAL RIGHT TO CHOOSE HER COUNSEL.**

There are certainly instances where an individual's Sixth Amendment rights may
potentially conflict – his or her right to counsel of choice on the one hand and his or her right to
an attorney of undivided client loyalties on the other.  This is not one of those instances.  But even
if it were, "the choice as to which right is to take precedence must generally be *left to the
defendant and not be dictated by the government*." *United States v. Perez*, 325 F.3d 115, 125
(2d. Cir. 2003) (emphasis added).

A client may be represented by conflicted counsel, so long as the client is informed of the
conflict and knowingly and intelligently waives it.  *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th
Cir. 1994).  To do so, the attorney must "communicate[] information reasonably sufficient to
permit the client to appreciate the significance of the matter in question," and the client must then
execute a written waiver demonstrating her informed consent.  *Visa*, 241 F. Supp. 2d at 1106
(citation omitted).  In determining whether the waiver was knowing and intelligent, a court
examines factors such as the (1) breadth of the waiver, (2) temporal scope of the waiver (whether
it waived a current conflict or whether it was intended to waive all conflicts in the future), (3)
quality of the conflicts discussion between the attorney and the client, (4) specificity of the
waiver, (5) nature of the actual conflict, (6) sophistication of the client, and (7) interests of justice.
*Id*.

Where a client has executed a knowing and intelligent waiver, the strong presumption in
favor of a client's right to counsel of choice may *only* be overcome by a showing of an "actual
conflict" or a "*serious* potential for conflict" between the lawyer and the client.  *Wheat*, 486 U.S.
at 164 (emphasis added).  The Ninth and Second Circuits have held that disqualification is
appropriate only if the conflict is "so egregious that no rational defendant would knowingly and
voluntarily desire the attorney's representation."  *Martinez*, 143 F.3d at 1270 (9th Cir. 1998)
(citation omitted); *see also United States v. Kliti*, 156 F.3d 150, 153 (2d. Cir. 1998)
(disqualification only appropriate where "the conflict is so severe that no rational defendant

OPPOSITION TO MOTION TO
DISQUALIFY
CR-18-259 (BLF)

4155-0039-4774.1

would waive it . . .").  In other words, disqualification is a last resort remedy that is proper only when the conflict is of a magnitude "as to indicate per se that the rendering of effective assistance will be impeded."  *Perez*, 325 F.3d at 125.  For any lesser conflict, the court "may accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel and permit the defendant to be represented by the attorney of his choice."  *Id.*; *see also United States v. Lightbourne*, 104 F.3d 1172, 1778-79 (9th Cir. 1997); *United States v. Partin*, 601 F.2d 1000, 1007-08 (9th Cir. 1979) (finding that petitioner had validly waived his right to conflict-free counsel because he was aware that a co-defendant represented by same counsel might decide to testify against him).

Here, the government has identified no actual conflict of interest, as none exists.  The government's Motion fails to even identify a credible *potential* conflict.  Moreover, Ms. Mogal and her co-defendants each have made knowing and intelligent waivers of any potential conflicts of interest, and have done so following advice from independent legal counsel.  Therefore, the Court should respect Ms. Mogal's right to her counsel of choice and deny the government's Motion.

A.      **Ms. Mogal obtained independent advice and knowingly and intelligently waived any potential conflict.**

An examination of the seven factors used by Ninth Circuit courts to analyze conflict waivers makes clear that Ms. Mogal's waiver was knowing and voluntary and should be accepted by this Court.  *See Visa,* 241 F.Supp. 2d at 1103-04*; see also Garcia*, 33 F.3d at 1197 (validating a conflict waiver where the defendant was "well aware of his interests, his right to an unbiased counsel, his right to seek outside legal advice, and his right to discuss with the court any dissatisfaction with his appointed counsel").

**First**, Ms. Mogal's waiver is narrow.  *See* Thompson Decl., Ex. A.  It is limited to her representation in the above-captioned Indictment and does not include other current or future representations.

4155-0039-4774.1

**Second**, the waiver is limited in temporal scope. This is not simply a waiver of "all conflicts in the future." *Visa*, 241 F. Supp. 2d at 1106. Rather, Ms. Mogal has waived only actual or potential conflicts that currently exist, and has agreed that if the circumstances change and new conflicts arise, she will promptly discuss them with Orrick and "determine whether Orrick's continued representation is appropriate." Thompson Decl., Ex. A.

**Third**, Ms. Mogal has had repeated, in-depth discussions with counsel regarding possible potential conflicts. Orrick first discussed these joint representation issues with Ms. Mogal in June of 2015, when she signed her initial engagement letter. Thompson Decl., Ex. M. As the circumstances changed (and new trade secret actions were brought), Orrick revisited these discussions. For example, when the government initiated its criminal investigation, Orrick discussed the potential ramifications with Ms. Mogal, including any potential conflicts stemming from its joint representation. Thompson Decl. ¶ 33. Orrick similarly revisited these issues following the government's identification of two unspecified individuals as "targets" of its investigation. *Id*. Shortly thereafter, in June 2017, Ms. Mogal executed a second waiver letter indicating that she understood that "there exist[ed] the potential for conflict" between her and the Defendants, and agreed to waive these potential conflicts. Thompson Decl., Ex. R. She received disclosures about, and consented to, Fitbit's advancement of fees and costs to represent her, as required by California Rule of Professional Conduct 3-310(F). *Id*. When the government indicted Ms. Mogal, and again when the government filed its Motion to Disqualify, Orrick yet again reexamined the conflict issues with Ms. Mogal in depth. *Id*.

But that is not all. Following the government filing its Motion, Ms. Mogal independently discussed the conflicts issues—including but not limited to the potential conflicts raised by the government in its Motion—with separate independent legal counsel, Miranda Kane, the former Criminal Division Chief for the United States Attorney's Office in the Northern District of California. Thompson Decl. ¶ 32. Following this independent advice, on August 24, 2018, Ms. Mogal signed a detailed waiver letter, waiving any potential conflicts at issue here. Thompson Decl., Ex. A.

**Fourth**, the waiver is specific. Ms. Mogal encourages the Court to review the detailed disclosures in the attached waiver letter, and, if it would be helpful to the Court, to discuss any issues with her in person. *Id.* These disclosures include any potential conflict with her co-defendants, for example, if they were to cooperate against her, or vice versa, as well as the any potential conflict regarding Fitbit paying Ms. Mogal's fees.

**Fifth**, as discussed in Section IV(D) below, the government does not allege an ***actual*** conflict, and the purported potential conflicts are based on pure speculation and belied by the underlying testimony and witness statements in the earlier civil cases.

**Sixth**, Ms. Mogal is sophisticated. She has a Master's of Business Administration from the Wharton Business School, an impressive resume of current and former employment, and experience managing hundreds of employees and running departments of companies. Thompson Decl. ¶ 34. Now, after being dragged through three years of acrimonious litigation by Jawbone, she has also become fairly knowledgeable of the legal process and the issues attendant to this case.

**Finally**, accepting Ms. Mogal's waiver will preserve the interests of justice. Given Ms. Mogal's knowing and intelligent waiver, she should be free to choose her counsel, particularly in this criminal action, where her liberty—her most fundamental right—is at stake.

Each of these factors independently and collectively argue in favor of the Court's acceptance of Ms. Mogal's knowing and intelligent waiver.

## B. Ms. Mogal's co-defendants knowingly and intelligently waived any potential conflict after independent advice.

It was not just Ms. Mogal who knowingly and intelligently waived any potential conflicts. So too have the other Defendants, each of whom were formerly Orrick clients and are now separately represented. *See* Thompson Decl., Exs. B-F. As with Ms. Mogal's waiver, these waivers are similarly narrow and limited to Orrick's representation of Ms. Mogal in the above-captioned action. *Id.* Moreover, not only did Orrick discuss the potential conflicts and execute valid waivers with these individuals during its joint representation, *see* Thompson Decl., Exs. L-Q

4155-0039-4774.1

& R-V, but each of these Defendants retained separate counsel in the criminal case prior to the filing of the government's Motion, and each of them discussed potential conflicts with their independent counsel before signing the waiver letters consenting to Orrick's representation of Ms. Mogal. Thompson Decl. ¶ 35. The co-defendants' waivers are specific, and expressly waive any potential conflict stemming from the Indictment, including the potential conflicts the government identifies in its Motion: "that in the case that any Individual Defendant becomes a witness, nothing related to Orrick's joint representation in the Prior Matters shall create a conflict of interest so as to require the disqualification of Orrick in its representation of Katherine Mogal," and that, subject to the attorney-client privilege, Orrick "will not be disqualified from examining or cross-examining any Individual Defendant because of its joint representation in the Prior Matters." Finally, like Ms. Mogal, these Defendants are sophisticated: each is well-educated, has extensive professional experience, and is knowledgeable about the legal process based upon his or her involvement in Jawbone's three-years of litigation against them. Thompson Decl. ¶ 36. Thus, accepting their knowing and intelligent waivers will serve the interests of justice.

Indeed, the fact that Mogal's co-defendants—the people whom the government suggests face these potential conflicts and who are in the best position to understand any such potential conflicts with Ms. Mogal—do not seek to set aside Orrick's representation of Ms. Mogal and specifically have waived any potential conflict, weighs heavily against disqualification. "[I]n the context of civil litigation . . . 'as a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification.' The ***refusal to disqualify in the absence of a motion by the former client is all the more appropriate in the context of a criminal prosecution with its implication of constitutional rights***." *United States v. Cunningham*, 672 F.2d 1064, 1072 (2d Cir. 1982) (emphasis added) (citation omitted); *see also SEC v. Tang*, 831 F. Supp. 2d 1130, 1142 (N.D. Cal. 2011).

### C.      Defendants' waivers satisfy the applicable ethical rules.

In addition to being knowing and intelligent, a waiver must also meet the applicable ethical standards. *Wheat*, 486 U.S. at 160; *In re County of Los Angeles*, 223 F.3d 990, 995 (9th

4155-0039-4774.1

Cir. 2000).  The government concedes that the relevant authority here is California Rule of Professional Conduct 3-310, which governs an attorney's joint representation of clients with potentially adverse interests.  Moreover, the government acknowledges that Rule 3-310 only requires Orrick to have: (1) "provided Mogal with a written disclosure detailing [its] previous relationships with her co-defendants," (2) "obtained informed written consent from all five of Mogal's co-defendants before continuing to represent Mogal," and (3) "obtained Mogal's informed written consent before continuing to represent her while being compensated by Fitbit." *See* Motion at 9-10.  It is undisputed that Orrick satisfied each of these requirements.  *See* Thompson Decl., Exs. A-F.  The government admits as much, saying that it "understands from [Orrick that it] has made these disclosures and obtained the requisite waivers . . . ."  Motion at 9. Given this admission, it is troubling that the government chose to assert nonexistent ethical violations against Orrick instead of simply asking the Court to confirm that Orrick made the required written representations.

### D.    There is no reason to set the valid waivers aside.

The Court should only invalidate Ms. Mogal's knowing and intelligent waiver and deprive her of counsel of her choosing if there is an actual conflict or serious potential for conflict that is "so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation." *Martinez*, 143 F.3d at 1270 (citation omitted); *Wheat*, 486 U.S. at 164.  No such conflicts exist here.  Indeed, it is the government's burden to demonstrate an actual or potential conflict, and the Motion falls far short.  *Skyy Spirits, LLC v. Rubyy, LLC*, 2009 U.S. Dist. LEXIS 109641, at *4 (N.D. Cal. Nov. 9, 2009).

#### 1.    There is no actual or serious potential for conflict between Defendants.

The government does not allege an actual conflict.  Nor could it.  Instead, it speculates that a potential conflict could hypothetically arise if one of the Defendants were to cooperate with the government and testify against Ms. Mogal.  Motion at 7-8.  In such a circumstance, the government incorrectly presumes that Orrick would be unable to effectively represent Ms. Mogal based upon its prior joint representation of the Defendants.  *Id.*; *see Cuyler v. Sullivan*, 446 U.S.

OPPOSITION TO MOTION TO
DISQUALIFY
CR-18-259 (BLF)

335, 348 (1980) ("[A] possible conflict inheres in almost every instance of multiple representation," and that alone is not grounds for disqualification).[4]  The government prophesizes that some unnamed Defendant—a Defendant who has already testified at length under oath, denied any and all intentional wrongdoing, and has never once tried to blame anyone else for this predicament—will now cooperate with the government and testify against Ms. Mogal at trial, even though four of the five co-defendants had ***never met, much less worked with*** Ms. Mogal, prior to the commencement of the civil litigation.  This prediction is far-fetched and fails to satisfy the government's burden to prove an irreconcilable potential conflict.  Indeed, Orrick has actively litigated multiple cases regarding the Defendants' alleged misappropriation of trade secrets for more than three years, has reviewed the relevant underlying materials at length, has had repeated discussions with each of the Defendants and Fitbit regarding conflicts issues, and to this day, remains unaware of any actual or serious potential for conflict.  Thompson Decl. ¶ 37. Nothing in the government's Motion establishes otherwise.

The government does not suggest that any of the Defendants would even have relevant information regarding one another, let alone information that would make them adverse.  With the exception of Ms. Mogal and Ms. Rosario, the government has never asserted that the Defendants even knew one another, worked with one another, or were in the same department at either Fitbit or Jawbone.  The government erroneously claims that Orrick conceded there was a potential conflict as to Ms. Rosario.  *See* Motion at 7.  To the contrary, Orrick made clear that it believed there was no serious potential for conflict, and only offered to look into separate representation for Ms. Rosario at the US Attorney's suggestion, so that it could move the case forward.  Thompson Decl. ¶ 30, Ex. W.

Moreover, the government's charging decision belies any risk that Defendants would develop competing interests.  The government chose to indict the Defendants under 18 U.S.C § 1832(a)(3), as opposed to charging a conspiracy under Section § 1832(a)(5).  *See* Docket No. 1.

---

[4]    The government incorrectly suggests that "the potential for a conflict of interest is determinative."  Motion at 3, 5, *citing United States v. Rewald*, 889 F.2d 836, 858 (9th Cir. 1989).  It is not.  The potential for a conflict must be "serious," which is a fact-specific inquiry.  *See e.g.*, *Wheat*, 486 U.S. at 164.

OPPOSITION TO MOTION TO
DISQUALIFY
CR-18-259 (BLF)

4155-0039-4774.1

Indeed, the Indictment does not mention or imply a conspiracy, or any form of concerted activity. *Id*. Rather, the government alleges that each Defendant engaged in independent acts of possession. *Id*. That makes the government's presumed "shift[ing of] responsibility" theory even more remote. Motion at 7.

Finally, the Defendants' prior sworn testimony all but ensures that the government's purported potential conflict never comes to fruition. As discussed in Section II above, each Defendant gave sworn deposition and trial testimony in an ITC action brought by Jawbone against Fitbit. There, Jawbone alleged that the Defendants misappropriated the same trade secrets that are at issue here, as well as others. Instead of pointing the finger at their co-defendants (whom they never worked with), Defendants testified that they did not misappropriate any trade secrets, and that there would have been no reason for them to do so. The Defendants have already told their story: it is not one of shifting blame, but one where Defendants categorically refute the baseless claims against them. Thompson Decl. ¶ 12. Indeed, not one of the Defendants made any inculpatory statement about another. *Id*. By failing to offer any evidence or explanation as to why Ms. Mogal or her co-defendants would suddenly change their sworn testimony, the government's speculation about a remote hypothetical conflict simply cannot rise to the "serious" potential for conflict required to overcome Ms. Mogal's right to her counsel of choice. *See Wheat*, 486 U.S. at 164.

Not surprisingly, courts regularly refuse to disqualify counsel based upon the type of potential conflicts alleged here, particularly where the alleged conflicts are inconsistent with the underlying facts. For example, in *United States v. Turner*, the Seventh Circuit reversed the trial court's decision to disqualify counsel who simultaneously represented two co-conspirators in a drug conspiracy (one at trial and the other during sentencing). 594 F.3d 946, 955 (7th Cir. 2010). The district court judge had presided over the first client's trial and "knew that the evidence there had suggested that [the second client] was [the first client's] sole cocaine supplier." *Id*. at 949. He found that it was "likely" that the jointly represented co-conspirator would cooperate with the government and testify against the attorney's other client, and on that basis found a disabling

conflict. *Id.* at 950.  The Seventh Circuit disagreed.  *Id.*  It examined the evidence and found that the government "certainly didn't act like" or "express the slightest interest in" obtaining the co-conspirator's testimony against the other client.  *Id.* at 953.  It further concluded that "nothing in this record . . . suggest[s] that the potential conflict of interest identified by the district court had a serious likelihood of maturing into an actual conflict.  Nor is there anything to support a conclusion that the conflict was sufficiently severe that Turner's right to effective counsel would be jeopardized."  *Id.* at 954.  The *Turner* court held that the disqualification was unreasonable and the alleged conflicts were "entirely speculative."  *Id.* at 953-54.  It determined that the "mere possibility that either [co-conspirator] might have a change of heart and decide to assist the government against the other" was insufficient to justify disqualification of the defendant's counsel of choice.  *Id* at 955.

This Court has ample basis to reach the same conclusion here.  Indeed, the alleged facts of this case weigh even more forcefully in Ms. Mogal's favor.  *Turner* involved a conspiracy.  Here, the government alleges only independent acts.  Thus, there would be no reason for the Defendants to testify against one another—their alleged conduct is unrelated.  Additionally, *Turner* dealt with concurrent representation.  Here, the representation is successive.  The rule against concurrent conflicts is less forgiving than successive.  *See Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914, 919 (N.D. Cal. 2003) ("Concurrent representation is evaluated under [a] more stringent standard than successive representation because the former involves not only the concern of a litigant obtaining a practical advantage in the latter litigation through *e.g.* the acquisition of confidential information gained from the counsel's prior representation, but also broader duty of undivided loyalty owed to the client and public confidence in the legal profession.").  Similarly, Federal Rule of Criminal Procedure 44 only requires independent judicial inquiry into joint representation, not successive representation.  *See Tang*, 831 F. Supp. 2d at 1145 (finding that where there is successive representation, the court need not even decide "whether [the firm's] representation of [codefendant] is adverse to [defendant]" where the defendants provided informed written consent).

Finally, the government fails to cite a single case where a court disqualified a law firm on facts similar to those in this case. This is not surprising given that courts consistently hold that the balance tips against the defendant's right to choose his counsel only rarely, in a "very narrow category of cases." *Perez*, 325 F.3d at 126-27. "[L]esser conflicts, such as an attorney's representation of two or more defendants *or his prior representation of a trial witness*, are generally waivable." *Id.* (emphasis added). Moreover, none of Mogal's co-defendants have joined in the government's motion. "[A]s a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification." *Tang*, 831 F. Supp. 2d at 1142 (citation omitted).

### 2. There is no actual or serious potential for conflict between Ms. Mogal and Fitbit.

As with the alleged conflicts between Defendants, neither is there a "serious" potential for conflict stemming from Fitbit's indemnification of Ms. Mogal. In fact, California law requires this indemnification. California Labor Code § 2802(a) states that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful." This includes attorneys' fees and expenses. *See Jacobus v. Krambo Corp.*, 78 Cal. App. 4th 1096, 1101 (2000). The government cannot credibly contend that by complying with its statutory obligations, Fitbit has created an unwaivable conflict between Orrick and Ms. Mogal. To the contrary, California courts have sanctioned parties for moving to disqualify on these same grounds. *See Karwasky v. Zachay*, 146 Cal. App. 3d 679, 681 (1983) (California Court of Appeal affirmed sanctions against plaintiff, finding the motion to disqualify frivolous because of "the absence of any statutory or case law supporting the motion to disqualify" and noting that the employer might have had an affirmative duty to indemnify its employee).

Moreover, Orrick is not currently representing Fitbit in this matter, nor is Fitbit a defendant. Simply put, there is no reason to believe that Fitbit's obligatory indemnification

4155-0039-4774.1

would have any impact on Orrick's zealous representation of Ms. Mogal. Indeed, Ms. Mogal has specifically waived this hypothetical conflict. Thompson Decl., Ex. A.

No matter how one spins it, this case lacks any "serious" potential for conflict, and the alleged potential conflicts here can and have already been knowingly and intelligently waived by the appropriate parties. As a result, to deny Ms. Mogal the right to counsel of her choosing would be to violate her Sixth Amendment rights.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, Mogal respectfully requests that the Court deny the government's Motion to Disqualify.

Dated: August 24, 2018                    ORRICK, HERRINGTON & SUTCLIFFE LLP


By:          /s/ Walter F. Brown
            WALTER F. BROWN
            MELINDA HAAG
            RANDY LUSKEY
            Attorneys for Defendant

4155-0039-4774.1