1   WALTER F. BROWN (SBN 130248)
    wbrown@orrick.com
2   MELINDA HAAG (SBN 132612)
    mhaag@orrick.com
3   RANDALL S. LUSKEY (SBN 240915)
    rluskey@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
5   405 Howard Street
    San Francisco, California  94105-2669
6   Telephone:     +1-415-773-5700
    Facsimile:     +1-415-773-5759
7
    Attorneys for Defendant
8   KATHERINE MOGAL

9

10                    UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                        SAN JOSE DIVISION

13

14   UNITED STATES OF AMERICA,              Case No. 18-CR-00259-BLF

15              Plaintiff,                  **DEFENDANT KATHERINE
                                            MOGAL'S NOTICE OF MOTION
16        v.                                AND MOTION TO DISMISS THE
                                            INDICTMENT**
17   KATHERINE MOGAL, et al.,

18              Defendant.

19

20

21

22

23

24

25

26

27

28

1  **TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

2      **PLEASE TAKE NOTICE** that on December 20, 2019 at 9:00 a.m., or as soon thereafter

3  as this matter may be heard, in the courtroom of the Honorable Beth L. Freeman, United States

4  District Judge, defendant Katherine Mogal will, and hereby does, move this Court to dismiss the

5  indictment against her due to the presentation of false and materially misleading testimony to the

6  grand jury.  This motion is based on the United States Constitution, the Federal Rules of Criminal

7  Procedure, the accompanying memorandum of points and authorities, the accompanying

8  Declaration of Walter F. Brown, Jr., the pleadings that have been filed in this matter, and such

9  further argument and evidence as may be presented prior to and during the hearing on this

10  motion.

11

12

13

14

15

16

17  Dated: December 6, 2019                Respectfully submitted,

18                             ORRICK, HERRINGTON & SUTCLIFFE LLP

19

20                             By: */s/ Walter F. Brown, Jr.*
                              Walter F. Brown, Jr.

21                                Attorneys for Defendant

22                                Katherine Mogal

23

24

25

26

27

28

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

   A.    The Grand Jury Proceedings ..................................................................... 3

      1.    Agent Engelbertson Testified That Ms. Mogal Failed to Identify the
            CrashPlan When Producing Documents to Jawbone and Mr. Garrie ........ 4

      2.    Agent Iqbal's Testimony ................................................................... 7

   B.    The Indictment .......................................................................................... 8

   C.    Agent Engelbertson's Testimony Was False Because Ms. Mogal Identified
         the CrashPlan in Both State Court Productions ....................................... 8

      1.    Ms. Mogal Identified the CrashPlan in the Initial Return of
            Materials to Jawbone on September 28-29, 2015 .................................... 8

      2.    Ms. Mogal Identified the CrashPlan in the Production of Materials
            to Daniel Garrie in October 2015 ............................................................ 10

III.  ARGUMENT ...................................................................................................... 11

   A.    Dismissal is the Appropriate Remedy Where the Government Presents
         Testimony it Should Have Known Was False to Obtain an Indictment .............. 11

   B.    The Government Elicited False Testimony from the Case Agents ...................... 13

   C.    The Government Should Have Known That it Elicited False Testimony
         From the Case Agents ............................................................................... 13

   D.    The Court Should Dismiss the Indictment Because the Proffered False
         Grand Jury Testimony was Material And Prejudiced Ms. Mogal ....................... 14

IV.   CONCLUSION ................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) ..................................................................................................... 12, 16

*Hayes v. Brown*,
    399 F.3d 972 (9th Cir. 2005)........................................................................................ 12, 14

*Napue v. Illinois*,
    360 U.S. 264 (1959) ........................................................................................................... 12

*People of Territory of Guam v. Muna*,
    999 F.2d 397 (9th Cir. 1993)............................................................................................ 12

*United States v. Basurto*,
    497 F.2d 781 (9th Cir. 1974)............................................................................................ 12

*United States v. DeRosa*,
    783 F.2d 1401 (9th Cir. 1986).............................................................................. 12, 13, 16

*United States v. Houston*,
    648 F.3d 806 (9th Cir. 2011).......................................................................................... 2, 12

*United States v. Linton*,
    502 F. Supp. 861 (D. Nev. 1980) ..................................................................................... 13

*United States v. Samango*,
    607 F.2d 877 (9th Cir. 1979)....................................................................................... 13, 13

*United States v. Velasquez*,
    No. CR 08-0730 WHA, 2011 U.S. Dist. LEXIS 134426 (N.D. Cal., Nov. 21, 2011)............ 15

*United States v. Young*,
    17 F.3d 1201 (9th Cir. 1994)............................................................................................ 13

*United States v. Zuno-Arce*,
    339 F.3d 886 (9th Cir. 2003)............................................................................................ 12

**Statutes**

18 U.S.C. § 1832(a)(3) ............................................................................................................ 8

19 U.S.C. § 1337 ..................................................................................................................... 3

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF

**Other Authorities**

U.S. Attorney Manual 9-11.233, *Presentation of Exculpatory Evidence* .................................... 16

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF

# I.    **INTRODUCTION**

While Katy Mogal worked at Jawbone, she used a cloud service called CrashPlan to back up her files.  CrashPlan made regular, automated copies of her Jawbone computer.  After leaving Jawbone, she never accessed her CrashPlan or any of the files it contained.

When Jawbone sued Ms. Mogal and her codefendants in San Francisco Superior Court and, later, before the International Trade Commission, the company demanded that Ms. Mogal disclose the devices or locations where Jawbone material might be stored.  She complied.  She promptly disclosed that she had used CrashPlan, and her attorneys produced to Jawbone files that had been stored there.

Jawbone lost its case before the ITC when the administrative law judge found that neither Ms. Mogal nor anyone else had taken any trade secrets.  Undeterred, Jawbone presented its allegations to the United States Attorney's Office in the hope that Ms. Mogal and others would be criminally prosecuted.  In its presentation, Jawbone informed the government that it had received, in Ms. Mogal's initial production, files from "Katy Mogal's CrashPlan Backup."

Some months later, the government began presenting evidence to the grand jury.  To obtain an indictment, it had to convince the grand jury that the presence of Jawbone documents on Ms. Mogal's CrashPlan was evidence of intentional theft rather than a mere oversight.  To meet this element, the government offered testimony that Ms. Mogal had repeatedly concealed the existence of her CrashPlan from Jawbone—something that she would not have done had her possession of these files been innocent.  The government told the grand jury that Ms. Mogal was given multiple opportunities to identify devices and accounts that might contain Jawbone documents and that she failed, over and over again, to reveal the existence of the CrashPlan.  And the government told the grand jury that this proved Ms. Mogal had intentionally stolen the files.  The case agent testified that "there were subsequent attempts, opportunities that documents could have been returned and they weren't," that while this "could have been a mistake once," he did not think "it could be a mistake twice or three times even," and that Ms. Mogal's purported repeated concealment of the CrashPlan demonstrated that "a theft or intentional theft" occurred.  Simply put, the evidence regarding Ms. Mogal's failure to return the CrashPlan was the

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF

1    centerpiece of the government's presentation about Ms. Mogal's *mens rea*, and it was all false.

2       An indictment must be dismissed if it was obtained through presentation of evidence that

3    (1) was actually false, (2) that the prosecution knew, or should have known, was false, and (3)

4    that was material, such that there is a "reasonable likelihood that the false testimony could have

5    affected" the grand jury's decision to indict.  *United States v. Houston*, 648 F.3d 806, 814 (9th

6    Cir. 2011).  The testimony that Ms. Mogal repeatedly hid her CrashPlan backup from Jawbone

7    was false.  The government should have known it was false.  And there was no evidence to

8    support a finding that she intentionally stole documents from Jawbone without the false

9    testimony.  The Court should dismiss the indictment.

10   **II.**  **BACKGROUND**

11      Roughly two months after Katherine Mogal, a user researcher with over two decades of

12   experience in the field, resigned from Jawbone on March 17, 2015, Jawbone brought a civil

13   lawsuit against her and others on May 27, 2015 in San Francisco Superior Court ("State Court

14   Action") alleging that Ms. Mogal had misappropriated the same trade secrets alleged here, among

15   others.  *See Aliphcom, Inc. v. Fitbit, et. al*., Case No. CGC-15-546004.  Shortly thereafter,

16   Jawbone filed another action against Fitbit before the International Trade Commission ("ITC

17   Action"), alleging nearly identical trade secret claims as those raised in the State Court Action.

18   *See In the Matter of Certain Activity Tracking Devices, Systems, and Components Thereof*, Case

19   No. 337-963.  Central to the allegations in both cases was that Ms. Mogal had set up a cloud-

20   based back-up service called CrashPlan on her Jawbone computer in December 2014, and that she

21   had failed to return the confidential Jawbone documents stored in the cloud on the CrashPlan

22   when she left Jawbone.

23      The ITC action was heard in May of 2016 before an Administrative Law Judge ("ALJ").

24   Ms. Mogal submitted written direct testimony and was cross-examined in person under oath by

25   Jawbone's counsel at the hearing.  *See* Brown Decl., Exs. 2, 3.  Ms. Mogal testified that she did

26   not intentionally take any confidential documents from Jawbone, that she had never once

27   accessed a single document from the CrashPlan, and that she had certainly never shared any

28   confidential Jawbone documents with anyone at Fitbit.  *Id*. Ex. 2 at 2-6.  Ms. Mogal candidly

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF

1 conceded that she should have been more careful about making sure she had returned every

2 Jawbone document from her personal devices and accounts when leaving the company, but she

3 reiterated that she never intended to keep these documents to injure Jawbone in any way. *Id.* at 2,

4 *see also id.* Ex. 3 at 294:21-295:24. Following a two-week trial, the ALJ prepared a written

5 opinion in which she found that neither Ms. Mogal nor Fitbit had misappropriated any trade

6 secrets in violation of 19 U.S.C. Section 1337. *Id.* Ex. 6. This decision was upheld by the ITC on

7 October 26, 2016. *Id.* Ex. 7.

8       Four months after this resounding defeat in the ITC Action, on February 7, 2017,

9 Jawbone's outside counsel made a presentation to the United States Attorney's Office for the

10 Northern District of California (the "government"), once again accusing Ms. Mogal and others of

11 intentionally stealing the same trade secrets from Jawbone and advocating for a criminal

12 prosecution. *Id.* Ex. 15. Approximately four months later, on June 29, 2017, the USAO began

13 presenting witness testimony to a grand jury. *Id.* Ex. 16.

14      **A.**     **The Grand Jury Proceedings**

15       The grand jury proceedings against Ms. Mogal focused on six specific user research

16 studies that were found on Ms. Mogal's CrashPlan after she resigned from Jawbone.

17       The government's presentation to the grand jury against Ms. Mogal centered completely

18 on the CrashPlan. Agent Iqbal testified that Ms. Mogal used the CrashPlan to back up

19 "everything" on her Jawbone computer, and that she "last synched" her CrashPlan to her Jawbone

20 computer on March 17, 2015, the same day she resigned from Jawbone. *Id.* Ex. 16 at 12. HSI

21 co-lead case agent Jason Engelbertson further testified that Ms. Mogal used the CrashPlan to back

22 up her Jawbone work files and emails and that the CrashPlan contained 589,362 files that were

23 "very responsive to the search terms" being used. *Id.* Ex. 23 at 28. Furthermore, Jawbone's

24 forensic expert from the ITC Action, Peter Garza, testified that the "*most significant information*

25 *we found for Ms. Mogal was that she used a backup program called CrashPlan.*" *Id.* Ex. 17 at 30

26 (emphasis added). In testimony immediately before asking the grand jury to return an indictment

27 against Ms. Mogal, Agent Iqbal testified that each of the six alleged trade secrets was "found in

28 her CrashPlan." *Id.* Ex. 21 at 7-10.

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF

The government needed to establish that Ms. Mogal possessed the six trade secret documents *knowing them to have been stolen*, and that she possessed them with the *intent to convert them* to the economic benefit of someone other than Jawbone, *intending* and *knowing* that her possession of these six documents would *injure Jawbone*. *Id.* Ex. 24 (Ninth Circuit Model Jury Instructions, Theft of Trade Secrets) at 8.141B. The evidence that Ms. Mogal never once accessed her CrashPlan after leaving Jawbone was undisputed. Therefore, the government solicited case agent testimony that, over the course of discovery in the civil litigation, when Ms. Mogal was required to return all Jawbone-related materials from her personal devices and accounts—Ms. Mogal had *failed to identify the CrashPlan* as a potential repository of Jawbone materials. The grand jury was informed that Ms. Mogal was given *multiple opportunities* to identify all of her devices and accounts that might contain Jawbone documents at various stages of the civil litigation, and that she failed, over and over again, to identify the CrashPlan at each and every juncture: first, on September 28-29, 2015, when her counsel produced documents to Jawbone in connection with the preliminary injunction briefing in the state court action; and yet again when her legal team turned over all of her devices and accounts to Mr. Garrie. *See, e.g.*, *id.* Exs. 16 at 21 and 19 at FITBIT2-010618; Ex. 20 at 8-9; Exs. 23 at 28-30, 18 FITBIT2-010293, and 19 FITBIT2-010308. (The discovery decisions and other litigation activities of Ms. Mogal's attorneys are, of course, utterly irrelevant, and the introduction of such evidence would unfairly prejudice Ms. Mogal, as argued in the Motion in Limine No. 1 to exclude references to Jawbone's Civil Trade Secrets Lawsuits filed December 6, 2019.) This, according to the agents, was clear evidence of criminal intent because it suggested that Ms. Mogal affirmatively tried to conceal the existence of the CrashPlan account, thus converting Ms. Mogal's conduct from a mere "mistake" to an intentional "theft." *Id.* Ex. 16 at 21. There was just one problem with this testimony: it was completely and indisputably false.

**1.  Agent Engelbertson Testified That Ms. Mogal Failed to Identify the CrashPlan When Producing Documents to Jawbone and Mr. Garrie**

Agent Engelbertson's testimony consisted primarily of summarizing discussions he had with Mr. Garrie. *Id.* at 5. He explained that Ms. Mogal and the other defendants had made two

- 4 -

1    independent productions of Jawbone materials in connection with the state court action.  *Id*. at 11-

2    12.  The first production came in September 2015, when counsel for the individual defendants

3    turned over documents directly to Jawbone in advance of the preliminary injunction hearing, and

4    the defendants each certified that—to the best of their knowledge and recollection—these

5    productions contained all Jawbone materials on their personal devices and accounts.  *Id*. at 28-30

6    and 18 at FITBIT2-010308.  The second production came in October 2015 when counsel for the

7    individual defendants turned over the clients' personal devices and accounts that potentially

8    contained Jawbone-related materials to Mr. Garrie.  *Id*.

9         Agent Engelbertson then testified that Ms. Mogal had omitted the CrashPlan—which he

10   reminded the grand jury contained 589,362 files that were "very responsive" to Jawbone search

11   terms—from both productions.  *Id*. Ex. 23 at 28.  With respect to the initial production, Agent

12   Engelbertson testified that "this was not provided during the initial . . . review that was done of

13   this material, this CrashPlan was not one of the items that was provided for review." *Id.* He

14   continued:

15                    AUSA:  So, we have -- when we saw in the timeline that there was
                     this August 2015 filing –
16
                     AGENT ENGELBERTSON:  Right.
17
                     AUSE:  -- where they said, "I've turned everything back over. I'm
18                   certifying" –

19                   AGENT ENGELBERTSON:  Right.

20                   AUSA:  -- "my signed declaration to a court of law" –

21                   AGENT ENGELBERTSON:  Yes.

22                   AUSA:  -- "that I've turned everything over," the CrashPlan
                     materials were not part of that certification?
23
                     AGENT ENGLEBERTSON:  That's correct . . . [the CrashPlan]
24                   *was not reviewed or turned over as part of that initial, "Hey, here's*
                     *everything you need to look at."*
25

26   *Id*. at 29 (emphasis added).

27        The government used a demonstrative exhibit in its grand jury presentation to re-

28   emphasize the point that the CrashPlan "was not originally identified as a repository during the

- 5 -

1    initial production of materials for review:"



2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

17   *Id.* Ex. 18 at FITBIT2-010308.

18         The government next elicited testimony that Ms. Mogal again hid the existence of this

19   critically important CrashPlan repository when producing materials to Mr. Garrie in October

20   2015:

21         AUSA:  So, when . . . Fitbit started turning stuff over to Law &
       Forensics, Mr. Garrie's company, in order to, "These are what we
22       want you to look at," *this CrashPlan was not identified as one of
       the things he was supposed to look at*?

23         AGENT ENGELBERTSON:  *That's right.*

24

25   *Id.* Ex. 23 at 28 (emphasis added).  Finally, the government informed the grand jury that Ms.

26   Mogal's failure to identify the CrashPlan was highly concerning because of the many real time

27   reminders she received from CrashPlan that she had the account:

28

- 6 -

AGENT ENGELBERTSON:  . . . what [Mr. Garrie] discovered because he had access to e-mail information for her and specifically this Gmail account that's listed here, he found in his review that it's hard to understand -- or his take on it was it would be *hard to understand why she would not provide that on the initial request* because up through January of 2016 she was getting automatic updates from CrashPlan notifying her that, "You have this CrashPlan account."  So, when the production request came forward, he didn't understand why she wouldn't have been aware of this CrashPlan account.

*Id*. at 29-30 (emphasis added).  In fact Ms. Mogal did know about the CrashPlan account, identified it to her lawyers days after the litigation was filed, and authorized the production of any appropriate materials from it to Jawbone.

## 2.     Agent Iqbal's Testimony

Agent Iqbal explained to the grand jury why Ms. Mogal's failure to identify the CrashPlan was so critical when assessing whether she *intended* to misappropriate trade secrets.  Agent Iqbal testified:

AUSA:  Okay.  And so, what sort of things have you done starting in August of 2016 in the name of the Grand Jury to sort of go back and look at what . . . these allegations that are between these two companies involved in a civil matter?

AGENT IQBAL:  Well, initially I had to review . . . the bulk of the – documents involved in the civil cases to kind of understand what exactly happened. . . .

AUSA:  Okay.  And what did you – what did you learn through focusing on those materials?

AGENT IQBAL:  Well, it seemed like reviewing the materials, that – that, in fact, something – well, a theft – it seemed to me a theft or at the very least improper retention had occurred. . . . [T]here was to me the data verification process meaning that, hey – you know, as I go through this kind of chain, that documents were taken and *there were subsequent attempts, opportunities that documents could have been returned and they weren't*.

Mainly my concern was that on the September 28th, 2015, at that point documents could have been returned.  And my concern on this is *could this have been a mistake*.  And *my determination was it could be a mistake once.  I don't necessarily think it could be a mistake twice or three times* even.

And then, I did an analysis.  I think that education was important, factoring that into account.  They're all IT kind of business, much more tech savvy than I am.  And the fact that there are very clear

- 7 -

1
2
> guidelines, and all that factored into my analysis of whether there
> was an actual – a basic line. *Was there a theft or intentional theft
> that occurred?  And my determination was yes.*

3   *Id.* Ex. 16 at 19- 21 (emphasis added).

4   **B.      The Indictment**

5   On June 14, 2018, the grand jury returned an indictment charging Katy Mogal with six

6   counts of Possession of Stolen Trade Secrets, in violation of Title 18 U.S.C. § 1832(a)(3).  The

7   indictment alleged that, after Ms. Mogal resigned from Jawbone on March 17, 2015, she

8   knowingly possessed six Jawbone user research studies that the government contends were

9   Jawbone's trade secrets, that she possessed these six documents knowing them to have been

10  stolen, and that she possessed them with the intent to convert them to the economic benefit of

11  someone other than Jawbone, intending and knowing that her possession of these six documents

12  would injure Jawbone.  Dkt. No. 1.  The government contends that all six of these documents

13  were found on Ms. Mogal's CrashPlan; these are the only versions of these six documents that the

14  government intends to introduce at trial (either during its case-in-chief or as 404(b) evidence).

15  Brown Decl., Ex. 22.

16  **C.      Agent Engelbertson's Testimony Was False Because Ms. Mogal Identified the
            CrashPlan in Both State Court Productions**

17
18  **1.      Ms. Mogal Identified the CrashPlan in the Initial Return of Materials
            to Jawbone on September 28-29, 2015**

19  Contrary to Agent Engelbertson's grand jury testimony, the CrashPlan was indeed one of

20  the repositories Ms. Mogal's counsel identified for Jawbone in connection with the preliminary

21  injunction briefing on September 28-29, 2015.  In her declaration attached to the opposition to

22  Jawbone's preliminary injunction motion in the state court action, Ms. Mogal stated that after

23  Jawbone filed its civil complaint against her on May 27, 2015, she "promptly relinquished control

24  over all accounts and devices in [her] possession that might contain any Jawbone-related

25  materials."  *Id.* Ex. 9.  She further stated that she understood "that these devices and account

26  information were provided to Stroz Friedberg, a forensics firm."  *Id.*  Also, on that same day,

27  Aaron Read, an Assistant Director of Digital Forensics at Stroz Friedberg, filed a separate

28  declaration in the state court action which attached a "Media Summary Report" listing each of the

- 8 -

devices and accounts included in its document production to Orrick, a production Orrick in turn reviewed and produced to Jawbone.  *Id.* Exs. 11 & 10.  Importantly, the *very first repository listed* on the "Media Summary Report" was Katy Mogal's CrashPlan:



| # | Image Date | Last Name | First Name | Device Type | Ownership | Device Name/Label | Brand | Model | Serial No. | Size (GB) |
|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 5/31/2015 | Mogal | Katy | Backup | personal | Mogal CrashPlan Backup | CrashPlan | N/A | N/A | 172 |
| 25 | 6/3/2015 | Mogal | Katy | External HDD | personal | Mogal External Drive | Western Digital | N/A | WD88EP00108BK | 1,024 |
| 26 | 6/5/2015 | Mogal | Katy | USB | personal | Mogal USB | the Arts) | N/A | N/A | 2.0 |
| 31 | 6/5/2015 | Mogal | Katy | Cloud Storage | personal | Mogal Dropbox (Logitech) | Dropbox | N/A | N/A | 20 |
| 32 | 6/5/2015 | Mogal | Katy | Cloud Storage | personal | Mogal Dropbox (Gmail) | Dropbox | N/A | N/A | 9.5 |
| 35 | 6/9/2015 | Mogal | Katy | External HDD | personal | Mogal-Seagate-External-1 | Seagate | BackupPlus for Mac | NA5PSF54 | 1,024 |
| 36 | 6/9/2015 | Mogal | Katy | External HDD | personal | Mogal-Seagate-External-2 | Seagate | BackupPlus for Mac | NA5PDA05 | 1,024 |
| 38 | 6/11/2015 | Mogal | Katy | Laptop | personal | Mogal Personal Laptop | Apple | MacBook Air | C1MPDCT3G944 | 250 GB |
| 40 | 6/16/2015 | Mogal | Katy | iPhone | personal | Katy's Personal iPhone | Apple | iPhone 5 | F17L29V2FH1C | 16 |

*Id.* Ex. 11 at Ex. B.  Moreover, the "Media Summary Report" clearly indicated that the CrashPlan was imaged by Stroz Friedberg on May 31, 2015, just four days after Jawbone sued Ms. Mogal in state court.  *Id.*  The notion that Ms. Mogal was somehow hiding or concealing the CrashPlan is pure fiction—Ms. Mogal handed over her CrashPlan account to her lawyers and forensic experts to be imaged sometime in the subsequent *four days* after the filing of the civil lawsuit.  And Stroz provided Jawbone-related documents from the devices listed in the "Media Summary Report" to Jawbone's outside counsel via email on September 28, 2015.  *Id.* Ex. 10.

A separate declaration filed on the same day by Michael Weil, a partner at Orrick, stated that on September 28, 2015, counsel "provided Jawbone with a file transfer portal that contained Jawbone-related materials copied from … [the clients'] personal computers, personal cell phones, personal email accounts, *personal cloud storage*, and other personal devices and accounts."  *Id.* Ex. 12 at 3 (emphasis added).

The government had or should have had the publicly available documents described above in its possession by the time Agent Engelbertson informed the grand jury under oath that the CrashPlan "was not originally identified as a repository during the initial production of materials for review."

Moreover, the government met with Jawbone's lawyers on August 4, 2016, when

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF

Jawbone first presented its allegations to the government, *id.* Ex. 4, and again on February 7, 2017, when Jawbone's lawyers made another presentation accompanied by a 22-page slide deck, *id.* Ex. 15.  The deck contained excerpts of an email from Orrick attorney James Thompson to Mr. Garrie, the forensic neutral, copying Jawbone's attorneys, stating that "Katy Mogal's CrashPlan Backup [] is essentially a backup of Ms. Mogal's Jawbone computer.… *Our September production included some, but inadvertently did not contain all of the files from this account*." *Id.* at FITBIT-003446 (emphasis added).  The presentation also indicated that "Jawbone had produced [to the government] all of the files produced by the Defendants … (*including their production prior to entry of the Preliminary Injunction*)," that the accompanying metadata would "indicate on which device or account a given file was found on," and stated that "[f]or the files with CTRL bates numbers, *those files were contained in the initial September 28, 2015 production by Defendants*." *Id.* at FITBIT-003449.  In other words, in a presentation from Jawbone's attorneys, the government was told, prior to presenting any grand jury testimony, that Ms. Mogal's counsel had produced documents from the CrashPlan in the initial production to Jawbone in September 2015 and produced the remainder of those documents—the ones that had been inadvertently excluded in the September 2015 production as described by Mr. Thompson, to Jawbone in December 2015.  The government should have known the testimony it presented to the grand jury was false.

### 2.     Ms. Mogal Identified the CrashPlan in the Production of Materials to Daniel Garrie in October 2015.

Contrary to Agent Engelbertson's grand jury testimony, the CrashPlan was also one of the repositories Ms. Mogal's counsel produced to Daniel Garrie in October 2015.  On October 29, 2015, Mr. Thompson emailed Mr. Garrie, copying Jawbone's outside counsel, stating: "Daniel, The devices and accounts that you will be receiving are reflected in the attached spreadsheet.  The devices are the originals.  We will be sending user names and passwords for the accounts once we've discussed per your request." *Id.* Ex. 1. Mr. Thompson attached a spreadsheet to his email that listed Ms. Mogal's CrashPlan on the *very first row*. *Id.*  The next day, Mr. Thompson sent Mr. Garrie via FedEx Ms. Mogal's physical devices and a printed list of passwords and log-in

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF

information for her online accounts, *including the CrashPlan account password. Id.* ¶ 16; *id.* at

Exs. 1 & 14.  And if that evidence wasn't sufficiently clear for the government, Mr. Garrie

acknowledged in his draft report, in a section with the description "Repositories Initially Provided

by Individual Defendants and Reviewed by L&F," that the CrashPlan *was* one of the repositories

that Orrick initially provided him:

| L&F Evi # | Stroz #[31] | Custodian | Device Type | Brand | Serial # | Total # of Files[32] | Evi. Received Date |
|---|---|---|---|---|---|---|---|
| AFE-512 | 14 | Katy Mogal | Backup | CrashPlan | N/A | N/A | 11/1/2015 |
| N/A[33] | 25 | Katy Mogal | External HDD | Western Digital | WDBBEP0010BBK | N/A | 11/1/2015 |
| AFE-102 | 26 | Katy Mogal | USB | Generic (CCA) | N/A | 13,101 | 11/1/2015 |
| AFE-502 | 31 | Katy Mogal | Cloud Storage | Dropbox | N/A | 119,424 | 11/1/2015 |
| AFE-503 | 32 | Katy Mogal | Cloud Storage | Dropbox | N/A | 50,692 | 11/1/2015 |
| AFE-505 | 33 | Ana Rosario | Webmail | Google | N/A | 104,504 | 11/1/2015 |
| AFE-506 | 34 | Rong Zhang | Webmail | Google | N/A | 12,697 | 11/1/2015 |
| AFE-202 | 35 | Katy Mogal | BackupPlus External HDD | Seagate | NA5P5F54 | 828,496 | 11/1/2015 |
| AFE-201 | 36 | Katy Mogal | BackupPlus External HDD | Seagate | NA5P0A95 | 884,526 | 11/1/2015 |
| AFE-402 | 37 | Patrick Narron | Pavilion | HP | 5CD3162KPS | 918,248 | 11/1/2015 |
| AFE-204 | 38 | Katy Mogal | MacBook Air | Apple | C1MPDCT3G944 | 955,172 | 11/1/2015 |
| AFE-203 | 39 | Ana Rosario | MacBook Air | Apple | C02GHAH3DJYC | 642,079 | 11/1/2015 |
| AFE-302 | 40 | Katy Mogal | iPhone 5 | Apple | F17L29V2FH1C | 65,630 | 11/1/2015 |
| AFE-206 | 41 | Katy Mogal | MacBook Pro | Apple | C2QK501ZF69W | 2,393,212 | 11/12/2015 |

*Id.* Ex. 8 at 7-8.  There is simply no factual dispute that Ms. Mogal and her counsel identified and

provided Mr. Garrie with access to Ms. Mogal's CrashPlan account in October 2015.  Grand jury

testimony to the contrary was false.

## III.   ARGUMENT

### A.   Dismissal is the Appropriate Remedy Where the Government Presents Testimony it Should Have Known Was False to Obtain an Indictment

"One of the bedrock principles of our democracy, 'implicit in any concept of ordered

liberty,' is that the [prosecutor] may not use false evidence to obtain a criminal conviction."

- 11 -

1   *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (quoting *Napue v. Illinois*, 360 U.S. 264, 269

2   (1959)).  This same rule applies to false testimony before the grand jury.  *United States v.*

3   *Basurto*, 497 F.2d 781, 786 (9th Cir. 1974).

4           To establish a Due Process violation, a defendant "must show that (1) the testimony . . .

5   was *actually false*, (2) the prosecution knew *or should have known* that the testimony was

6   actually false, and (3) that the false testimony was *material*."  *United States v. Houston*, 648 F.3d

7   806, 814 (9th Cir. 2011) (emphasis added) (quoting *United States v. Zuno-Arce*, 339 F.3d 886,

8   889 (9th Cir. 2003)).

9           The standard for determining whether error in the grand jury proceedings justifies

10  dismissal of an indictment differs when the error is considered prior to or after the conclusion of a

11  trial.  *People of Territory of Guam v. Muna*, 999 F.2d 397, 399 (9th Cir. 1993).  Where, as here,

12  the motion is brought before trial, the court must dismiss if the defendant has been prejudiced by

13  the false testimony presented to the grand jury.  *Bank of Nova Scotia v. United States*, 487 U.S.

14  250, 255 (1988).  Prejudice is established if "the violation substantially influenced the grand

15  jury's decision to indict or if there is grave doubt that the decision to indict was free from

16  substantial influence of such violations."  *Id.* at 256.  Dismissal is warranted if the false testimony

17  "significantly infringed upon the grand jury's ability to exercise its independent judgment."

18  *United States v. DeRosa*, 783 F.2d 1401, 1405 (9th Cir. 1986).  In assessing materiality, the court

19  "must determine whether there is *any reasonable likelihood* that the false testimony *could have*

20  *affected*" the decision to indict.  *See Hayes*, 399 F.3d at 984 (emphasis added) (internal quotation

21  omitted).

22          The presentation of false testimony need not be intentional to justify dismissal.  *United*

23  *States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979).  In *Samango*, the Ninth Circuit affirmed a

24  district court's dismissal of an indictment based on its supervisory powers because, among other

25  things, the prosecutor had not informed the grand jury of prior inconsistent statements made by

26  grand jury witnesses even though the court found that the prosecution did not intentionally

27  mislead the grand jury.  To the same effect, a district court in this circuit in ruling on a motion to

28  dismiss an indictment, found that testimony given by law enforcement agents, "should not in a

1    substantial way misstate relevant and crucial evidence to the extent that the grand jury is so

2    misled that . . . it cannot be deemed the fair and impartial body to which the accused is entitled."

3    *United States v. Linton*, 502 F. Supp. 861, 871 (D. Nev. 1980).  The "relevant inquiry focuses on

4    the impact . . . on the grand jury's impartiality, not on the degree of the prosecutor's culpability."

5    *DeRosa*, 783 F.2d at 1405.  "[E]ven unintentional misconduct may be sufficient."  *Id*. at 1406.

6    "A government's assurances that false evidence was presented in good faith are little comfort to a

7    criminal defendant wrongly convicted on the basis of such evidence.  A conviction based in part

8    on false evidence, even false evidence presented in good faith, hardly comports with fundamental

9    fairness."  *United States v. Young,* 17 F.3d 1201, 1203-04 (9th Cir. 1994).

10          **B.      The Government Elicited False Testimony from the Case Agents**

11          Agent Engelbertson's testimony that Ms. Mogal failed to identify the CrashPlan in her

12   productions was demonstrably false.  As set forth above, Ms. Mogal and her counsel identified

13   the CrashPlan as a repository of Jawbone-related information in connection with both her initial

14   production of materials to Jawbone on September 28, 2015 (and in fact produced documents from

15   her CrashPlan on that date), and in her subsequent production of devices and accounts to

16   Mr. Garrie in October 2015.  Thus, it was patently false for Agent Engelbertson to tell the grand

17   jury that "this CrashPlan was not one of the items that was provided for review" in connection

18   with the initial production, or that the CrashPlan was "not identified as one of the things

19   [Mr. Garrie] was supposed to look at" by Ms. Mogal when she provided her devices and accounts

20   to Mr. Garrie.  Brown Decl., Ex. 23 at 28.

21          **C.      The Government Should Have Known That it Elicited False Testimony From
                    the Case Agents**

22

23          The government should have known it was presenting false testimony.  On February 7,

24   2017—six months prior to eliciting the offending testimony—the government was informed, in

25   no uncertain terms, that Ms. Mogal had included documents from the CrashPlan in her initial

26   production to Jawbone.  Brown Decl., Ex. 15 at FITBIT-003446 ("*Our September production [to*

27   *Jawbone] included some … of the files*" from "*Katy Mogal's CrashPlan Backup*") (emphasis

     added).  The government was also informed that Ms. Mogal's counsel informed Jawbone that

28

                                                    - 13 -

1    some documents from the CrashPlan had been inadvertently omitted from the initial production

2    and were then produced approximately seven weeks later.  *Id.*  Moreover, Jawbone provided the

3    underlying documents from the September 2015 production to the government, and the

4    government could have confirmed that Ms. Mogal had in fact produced documents from her

5    CrashPlan.  *Id.* at FITBIT-003449.

6         Other documents similarly establish that the government should have been aware that

7    Agent Engelbertson's sworn testimony was false.  For example, the government's Report of

8    Investigation ("ROI") No. 28, which was "approved" on January 27, 2017—long before the

9    government presented the false testimony—discusses the September 29, 2015 Read Declaration.

10   Brown Decl., Ex. 5.  The ROI quotes Mr. Read's statement that "30 separate devices or accounts

11   [were] provided by MOGAL [and others]" to Stroz in connection with the initial production, and

12   the *first of those repositories listed by Mr. Read is none other than Ms. Mogal's CrashPlan*.  *Id.*

13   at 5, *id.* Ex. 11.  The Weil Declaration similarly stated that on September 28, 2015, Ms. Mogal

14   and the other individual defendants had "provided Jawbone with a file transfer portal that

15   contained Jawbone-related materials copied from their personal computers, personal cell phones,

16   personal email accounts, *personal cloud storage*, and other personal devices and accounts."  *Id.*

17   Ex. 12 at 3 (emphasis added).  The government's meetings with Mr. Garrie and Jawbone's

18   counsel also provided further opportunities for investigation and clarification of these facts.  The

19   government should have known it was providing false testimony regarding Ms. Mogal's

20   production of the CrashPlan to Mr. Garrie.

21        **D.    The Court Should Dismiss the Indictment Because the Proffered False Grand
               Jury Testimony was Material And Prejudiced Ms. Mogal**

22        The government's repeated emphasis and heavy reliance on the false evidence created

23   more than a "reasonable likelihood that the false testimony could have affected" the grand jurors'

24   decision to indict and was therefore material.  *Hayes*, 399 F.3d at 984.  The central issue

25   presented to the grand jury as to Ms. Mogal was that her failure to return six purported Jawbone

26   trade secrets from her CrashPlan after resigning from Jawbone was not a simple *mistake* but

27   rather, an *intentional* act of criminal misconduct.  The case agents viewed the purported repeated

28

- 14 -

1  failure to turn over the CrashPlan account as undeniable evidence of criminal intent, a view they

2  shared with the grand jury.  Agent Iqbal, who testified that multiple missed opportunities to

3  identify the CrashPlan made it unlikely Ms. Mogal had merely been mistaken or forgetful, drew a

4  connection between this purported evidence and Ms. Mogal's intent in testimony worthy of a

5  closing argument at trial.  He first posed the question to the grand jury ("Was there a theft or

6  intentional theft that occurred?")—and then answered his own question in the affirmative ("And

7  my determination was yes.") Brown Decl. Ex. 16 at 20- 21.  Agent Engelbertson emphasized to

8  the grand jury that Ms. Mogal's receipt of periodic email updates from CrashPlan about her

9  account made it especially troubling that she chose not to disclose it after Jawbone sued her to

10  demand its return.  *Id.* Ex. 23 at 29-30.  The problem was that Agent Iqbal and Agent

11  Engelbertson were both wrong.

12          Without the false testimony, there was little else before the grand jury to suggest that

13  Ms. Mogal had *intentionally* misappropriated the six documents in her CrashPlan and therefore

14  deserved to be charged with a crime.  *See United States v. Velasquez*, No. CR 08-0730 WHA,

15  2011 U.S. Dist. LEXIS 134426, at *12 (N.D. Cal., Nov. 21, 2011) ("[C]ourts must inquire

16  whether there was sufficient non-perjurious testimony presented to the grand jury to support the

17  indictment.").  There was some testimony regarding Ms. Mogal's personal devices and accounts

18  other than the CrashPlan, but the government did not focus on whether these other devices and

19  accounts contained any of the alleged trade secrets.  Indeed, the government has stipulated that

20  the only versions of the alleged six trade secrets it intends to offer into evidence at trial all came

21  from Ms. Mogal's CrashPlan.  *See* Ms. Mogal's Motion in Limine No. 5; Brown Decl. Ex. 22.

22  The focus was always on the CrashPlan..  Brown Decl., Exs. 17 at 30 (the "*most significant*

23  *information* we found for Ms. Mogal was that she used a backup program called CrashPlan"); 18

24  (FITBIT2-010294-95) (leading with and focusing on the CrashPlan evidence in the demonstrative

25  exhibits).  Not surprisingly, the CrashPlan is the only repository mentioned in Agent Iqbal's June

26  14, 2018 testimony—the same date Ms. Mogal was indicted—when he walked the grand jurors

27  through each of the six alleged trade secrets.  *Id.* Ex. 21 at 7-10.

28          In addition to what the government presented to the grand jury, it is also important to look

- 15 -

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF

at what it intentionally left out.  The government chose *not* to present evidence that Ms. Mogal (1) never once accessed a single document in her CrashPlan after leaving Jawbone; (2) never once logged into the CrashPlan after leaving Jawbone; and (3) never downloaded any of the alleged trade secrets from her CrashPlan to her computer at Fitbit.  That was the government's prerogative—the government need not present all exculpatory evidence to the grand jury, even though it is certainly best practice to do so.  *See* U.S. Attorney Manual 9-11.233, *Presentation of Exculpatory Evidence*.  While the government may have had no affirmative obligation to inform the grand jury about these exculpatory details regarding Ms. Mogal's use of the CrashPlan, it certainly was not allowed to present affirmative falsehoods to the grand jury and then to argue that Ms. Mogal intentionally tried to hide the existence of the CrashPlan from Jawbone.  That is what happened here.  Ms. Mogal was prejudiced by this testimony and the Court should have "grave concerns" that these falsehoods "substantially influenced the grand jury's decision to indict."  *Bank of Nova Scotia*, 487 U.S. at 256.  They unquestionably "infringed upon the grand jury's ability to exercise its independent judgment."  *DeRosa*, 783 F.2d at 1405.

## III.     <u>CONCLUSION</u>

For the foregoing reasons, Ms. Mogal respectfully requests that the Court grant her Motion to Dismiss the Indictment.

Dated: December 6, 2019                    Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP


By: */s/ Walter F. Brown, Jr.*
Walter F. Brown, Jr.

Attorneys for Defendant
Katherine Mogal

DEFENDANT MOGAL'S MOTION TO DISMISS
CASE NO. 18-CR-259-BLF