1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  AMIE D. ROONEY (CABN 215324)
   SUSAN F. KNIGHT (CABN 209013)
5  Assistant United States Attorneys

6       150 Almaden Boulevard, Suite 900
        San Jose, California 95113
7       Telephone: (408) 535-5061
        FAX: (408) 535-5066
8       Amie.Rooney@usdoj.gov
        Susan.Knight@usdoj.gov
9
   Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| UNITED STATES OF AMERICA, | ) **CASE NO. 18CR0259-BLF** |
|---|---|
| Plaintiff, | ) **UNITED STATES' TRIAL MEMORANDUM** |
| v. | ) Hearing Date: December 20, 2019 |
|  | ) Hearing Time: 9:00 a.m. |
| KATHERINE MOGAL, | ) Trial Date: January 21, 2019 |
|  | ) Courtroom: 3 |
| Defendant. | ) |
|  | ) Hon. Beth Labson Freeman |

The United States of America ("United States") hereby respectfully submits the following Trial Memorandum, pursuant to the Court's Standing Order Re: Criminal Trials, Sec. VIII. Defendant Katherine Mogal is charged in the Indictment with six counts of possession of stolen trade secrets in violation of 18 U.S.C. § 1832(a)(3) (Counts 1, 2, 10, 11, 12, & 13). Trial on all Counts against this individual defendant is currently set for jury selection on January 21, 2020, with a pretrial conference scheduled for December 20, 2019 at 9:00 a.m.

**I.  Statement of the Case**

    **A.  Summary of the Evidence**

The United States anticipates that the admissible evidence at trial will demonstrate the following:

U.S. v. MOGAL, UNITED STATES' TRIAL MEM.  1
18CR0259-BLF

Founded in 1999, AliphCom, Inc. DBA Jawbone, ("Jawbone") was, during the relevant time period, a world leader in consumer technology and wearable devices, having invented and popularized both Bluetooth headsets, wireless speaker technology, and the first wrist-worn tracking device, with a focus on building devices and developing software platforms utilizing data science and extensive market research. In particular, Jawbone developed and implemented a unique model for product development (for the time) which it viewed as critical to its success: in depth, directed, and comprehensive consumer research to determine what it was that consumers would most like to see, best respond to, and use consistently in personal and/or wearable technology. Because it placed such an emphasis on this pathway to developing the next "big thing" in consumer technology, Jawbone devoted substantial resources (in time and money) to this consumer research effort – far in excess of what any of their direct competitors was doing at the time. Moreover, the consumer research team was cohesively joined with all other aspects of Jawbone's operations, demonstrating its importance to the company.

In its role as an "innovator," Jawbone went to great lengths to tightly control access to confidential information, protecting documents, designs, and business information in whatever form, from being distributed or disclosed to the public or competitors. To this end, Jawbone required that each of its employees, vendors, manufacturers, and other business partners who might come into contact with confidential Jawbone information, to review and sign confidentiality and/or non-disclosure agreements prior to gaining access to such information. Specifically, employees were made to sign the Confidential Information and Inventions Assignment Agreement which states, in relevant part:

> [A]t all times during my employment and after my employment ends for any reason . . . ., I will hold in strictest confidence, and not use, except for the benefit of the Company, or disclose to any person, firm, or corporation without written authorization of the Chief Executive Officer of the Company ("CEO"), any Confidential Information of the Company. I understand that "Confidential Information" means any and all Company confidential information, proprietary information, technical data, trade secrets or knowhow, including, but not limited to, information related to research, product plans, products, services, customers, customer lists, and other customer data (including, but not limited to, information concerning customers on whom I called or with whom I became acquainted during my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, personnel, business plans, strategic plans, or other business information disclosed to me by the Company, either directly or indirectly in writing, orally, or by drawings or observation of parts or equipment, or developed by me, solely or jointly with others.

*See* Confidentiality Agreement at 1.

Jawbone also had a comprehensive information technology policy which required employees to refrain from accessing or copying any confidential information onto personal devices, directing employees that "[a]ll work-related activities should be performed on Jawbone-provided computers," to refrain from "us[ing] personally-owned computers for work purposes," and to "never" send sensitive information "in emails other than between @jawbone.com addresses." Further, employees who were leaving the company were reminded of their continuing obligation to preserve the confidentiality of Jawbone's proprietary information and trade secrets, and, for further emphasis, were required to sign an Acknowledgement of Proprietary Information, identifying many specific categories of this information that must remain confidential. Expressly included on that list, and relevant to the instant case, were

- Research and development activities, methods, procedures, plans, and strategies;
- Sales and marketing information, including pricing information, customer lists, contacts, habits, sales techniques, plans and surveys.

The defendant was formerly the "Director of Market and Customer Experience Insights" at Jawbone. Upon her departure from Jawbone on March 17, 2015, the defendant allegedly took, among other things, reports containing analysis and information generated by the victim company's consumer research program. The United States has elected to charge the defendant with the unlawful possession of six separate documents, each of which is alleged to be a compilation trade secret. It is anticipated that the evidence will show, in particular through the testimony of forensic experts and Jawbone personnel, that the defendant maintained one or more unapproved personal repositories of Jawbone documents, including two cloud-based applications (CrashPlan and Dropbox), where she knowingly placed, accessed, and manipulated Jawbone proprietary materials. In addition to the six charged documents, the United States has moved under Federal Rule of Evidence 404(b) to introduce additional evidence at trial, including documents and testimony, that the defendant had in her possession other documents and information beyond the charged documents which demonstrate her intent, plan, knowledge, absence of mistake, or lack of accident. [*See* U.S. First Motion *in Limine*, Docket No. 133.]

Following her departure from Jawbone, defendant was employed by Fitbit as "Director of UX Research."

**B. The Charges**

    **1.  18 U.S.C. § 1832(a)(3) – Possession of Stolen Trade Secrets**

The elements the United States must prove for all six of the charged counts against this defendant are as follows:

    a)     The defendant knowingly received or possessed a trade secret knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

    b)     The defendant intended to convert a trade secret to the economic benefit of anyone other than the owner;

    c)     The information was, in fact, a trade secret;

    d)     The defendant intended or knew the offense would injure the owner of the trade secret; and

    e)     The trade secret was related to or included in a product that is produced for or placed in interstate or foreign commerce.

Further, the statutory definition of "trade secret" is contained in 18 U.S.C. § 1839(3) as follows:

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing, if –
>
> (A) The owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) The information derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

In a criminal trade secret case, the United States is not required to make a pretrial offer of proof of the trade secrets. Whether particular information is a trade secret is a question of fact, not law. *See* Ninth Circuit Model Criminal Jury Instruction 8.141C; *United States v. Chung*, 659 F.3d 815, 824-25 (9th Cir. 2011) (evaluating whether there was sufficient evidence at trial that particular documents were trade secrets under the EEA); *United States v. Asgari*, 2018 WL 1151562 (N.D. Ohio Mar. 5, 2018) ("The

existence of a trade secret is a central element to a theft of trade secrets charge. It is not an ancillary factual issue unconnected to the merits that the Court may decide before trial.").

A trade secret need not be novel or even non-obvious. *See e.g., Kiwanee Oil Co., v. Bicron Corp.,* 416 U.S. 470, 476 (1974); *Learning Curve Toys Inc. v. Playwood Toys, Inc.,* 342 F.3d 714, 724 (7th Cir. 2003). Even if the individual elements are in the public domain, a combination of those elements can be a trade secret if it offers a competitive advantage and is not readily ascertainable. *See e.g., Servo Corp of America v. General Electric Co.,* 393 F.2d 591 (4th Cir. 1968); *3M v. Pribyl*, 259 F.3d 587 (7th Cir. 2001). Of particular note, the Ninth Circuit has held that "a trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources. . . . 'the fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of individual elements." *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 cmt. f (1995)).

Whether an owner took "reasonable measures" to keep the information secret is a factual determination. Security measures need not be absolute or the best available; they need only satisfy the standard of reasonableness under the facts and circumstances of the specific case. *See e.g., United States v. Howley,* 707 F.3d 575, 579 (6th Cir. 2013). To qualify as a trade secret, the information must also derive independent economic value from not being generally known to someone who can make use of that information. No specific actual value must be proved, only a showing of *potential* value is required. *See United States v. Jin*, 733 F.3d 718 (7th Cir. 2013). The United States may demonstrate value through the circumstances of the offense, or the time and money that would need to be spent by a third party to replicate the information. *See United States v. Lange,* 312 F.3d 263, 269 (7th Cir. 2002).

The United States has charged this defendant with the possession of six separate documents, identified by specific description in the indictment in the following counts:

| Count | Date Defendant left Jawbone | Jawbone Trade Secret | Name of Document | Fuller Description from Indictment, Paragraph 10 |
|---|---|---|---|---|
| One | March 17, 2015 | A | Audio Now Study | "Jawbone's proprietary and confidential qualitative survey conducted of users of small-form speaker products, describing the results of inquiries into timing and location of small speakers, threshold of convenience for use of an external speaker versus an internal device speaker, and other factors affecting a user's decision to purchase a speaker. The study, which had been professionally designed, implemented, and summarized at considerable expense, was part of Jawbone's overall concentration on and investment in research and development, and contained substantial proprietary and confidential information, including but not limited to a roadmap for future steps and product development based on the research conclusions. Only authorized team members had access to the study, and limitations were placed on the use and copying of the study." [Indictment, p. 3-4] |
| Two | March 17, 2015 | B | Chinese User Market Study | "Jawbone's proprietary and confidential multi-faceted study of Chinese consumers, providing highly specific information about users' motivations, influences, desired features, brand preferences, reasons for purchasing fitness trackers, and shopping methodologies. The 53-page document is marked with a legend specifying it to be "proprietary and confidential," and contains a significant volume of information, both quantitative and qualitative, about users in one of the world's most important consumer markets. Only authorized team members had access to the study, and limitations were placed on the use and copying of the study." [Indictment, p. 4] |
| Ten | March 17, 2015 | J | Daily Diary Study | "A journal-based qualitative study with 18 participants who used both Jawbone's UP24 electronic fitness tracker and Fitbit wristbands, seeking to understand how users interact with wearable devices, assessing users' needs, goals, and perceptions. This comprehensive study of user preferences, particularly in the comparison between Jawbone and Fitbit products, was a "Foundational" document for Jawbone." [Indictment, p. 5] |

| Count | Date Defendant left Jawbone | Jawbone Trade Secret | Name of Document | Fuller Description from Indictment, Paragraph 10 |
|---|---|---|---|---|
| Eleven | March 17, 2015 | K | User Segmentation Study | "A quantitative study of over 1400 Jawbone users inquiring into users' backgrounds, reasons for purchasing fitness trackers, interest in health and fitness, and motivation. Containing the legend "Proprietary and Confidential," this study was the starting point of subsequent efforts by Jawbone to define user personas and archetypes to better understand market segmentation to develop and produce for sale more specific, targeted products beyond basic unitary features. Information contained in this 73-page document served as the basis for much of Jawbone's product roadmap, and had significant economic value to Jawbone." [Indictment, p. 5-6] |
| Twelve | March 17, 2015 | L | Lifestyle Tracker Shopper Journal Study | " A quantitative study of fitness tracker owners, inquiring into users' desired features, shopping research, familiarity with various brands and products, motivation to use a tracker device. This document contained information on user comparisons between Jawbone and Fitbit." [Indictment, p. 6] |
| Thirteen | March 17, 2015 | M | International Tracker Market Study | "A quantitative study of over 1500 European Jawbone users inquiring into users' expectations, desired features, reasons for purchasing fitness trackers, and shopping methodology." [Indictment, p. 6] |

Charging a particular document as the unit of prosecution in trade secret cases has been recognized and upheld by the Ninth Circuit. *See, e.g.*, *United States v. Chung*, 659 F.3d 815, 824 (9th Cir. 2011) ("Of the 300,000 pages of Boeing documents that were found in Defendant's home, the government identified six that allegedly contained trade secrets. Each document underlies a separate EEA count in the indictment."); *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) (three specific source lists charged are "classic examples of a trade secret that derives from an amalgam of public and proprietary source data"); *Sing*, 736 Fed. App'x at 185 (affirming conviction based upon "five individual schematics"). The parties have stipulated to the file paths on the defendant's device where each charged document could be found, as well as the specific elements in each document which the United States contends, in compilation, qualify the documents as trade secrets. In keeping with its

promised obligation to further specify by November 1, 2019, the United States supplemented the list in each case with a description of the "methodology" of these studies as the way in which Jawbone approached what kind of study it would do in order to tailor it to the internal business audience and purpose of the research, built on a unique-in-the-industry program of user research that had been in existence and valued at Jawbone for many years as crucial to its innovation business model. [*See* United States Response to Defendnat's Motion to Enforce the Stipulation, at Docket No. 127 and Court's Order Granting Defendant Mogal's Motion to Enforce the Stipulation, dated November 26. 2019.]

### (i) The defendant knowingly received or possessed a trade secret knowing it to have been stolen or appropriated, obtained, or converted without authorization

The defendant maintained possession of all six of the charged trade secret documents in a "CrashPlan" repository that she personally secured in or about December 2014. CrashPlan is a cloud-based backup service that allows its users to back-up their data on, among other places, hard drives. At the time the defendant purchased this storage, Cameron Bailie, Jawbone's IT Manager, was unaware that she had installed the program on her work computer. If she had asked for the program or a similar means to back up her data on her work device, he would have installed it for her using an enterprise solution rather than a solo-consumer product. The company only learned about her use of CrashPlan when forensic expert Daniel Garza discovered it while examining her Jawbone work computer. Further forensic examination of the defendant's CrashPlan by forensic experts at Law & Forensics and government agents revealed that she possessed the six alleged trade secrets along with additional documents that were both identical to and more than a 90 percent match to the charged trade secrets. The defendant also stored documents matching the alleged trade secrets in her personal Dropbox account. The defendant was aware that she was required to return all Jawbone material to the company upon her termination because she had signed a Confidential Information and Invention Assignment Agreement (*supra* at 2) and a termination certification stated that she "[had] not made or retained copies, reproductions, or summaries of any Company Property, and have returned all Company Property in its present condition without deletion or alternation."

Business record evidence and testimony from percipient witnesses, as well as forensic evidence through noticed experts, will be presented by the United States in its case-in-chief.

### (ii) The defendant intended to convert a trade secret to the economic benefit of *anyone* other than the owner

Knowing of her obligations to keep confidential all Jawbone proprietary materials from documents she signed when she accepted her position at Jawbone, not share them outside the company without prior authorization pursuant to various Jawbone written policies, and acknowledgement of her duty to return all Jawbone material to the company upon her termination or resignation, the defendant nevertheless maintained a full repository of Jawbone documents outside of the approved channels and without receiving authorization to do so. Moreover, she used substantial portions of Jawbone proprietary material from Trade Secret A in one or more presentations that she gave to other companies, including Fitbit, during her job application process, plainly demonstrating her intent to convert the Jawbone trade secrets to someone else's economic benefit – even her own. Forensic evidence and testimony will be presented by the United States in its case-in-chief.

### (iii) The information was, in fact, a trade secret

In the year or two leading up to the defendant's resignation from the company in March 2015, Jawbone was steps ahead of the competition in the area of wearable devices, and made substantial efforts to guard their trade secrets through legal means, including by requiring employees to sign the Confidential Information and Invention Assignment Agreement. The company also required employees to watch an information technology security slide show detailing, among other things, the company's information security policies. Furthermore, Jawbone derived economic value from keeping secret the data and analysis from the user experience and market analysis studies contained in the six alleged trade secrets. The studies gave Jawbone a competitive advantage in the marketplace because, among other things, the studies informed their product strategy and the company roadmap to develop future products and features that were important to consumers. The United States will offer testimony of multiple Jawbone executives as the people most knowledgeable with regard to the reasonable measures, economic value, and company view of the documents.

### (iv) The defendant intended or knew the offense would injure the owner of the trade secret

Jawbone invested a significant amount of employee time and resources on the data and analysis derived from the studies contained in the six alleged compilation trade secret documents. This

information fueled Jawbone's innovations in the marketplace, and would be extremely valuable to a competitor because it would provide a competitive edge over Jawbone by use of the data to develop products responsive to consumers' needs and feature preferences without expending their own significant resources to gain the same insights. It would also allow a competitor to make strategic choices to try and "beat" Jawbone to market on new products and software development. The defendant, as a key employee in the group that Jawbone relied upon to inform and drive its strategic innovation decisions, was well aware of the value of the material. Further, the testimony will show that the defendant knew that Jawbone, locked in competition with Fitbit as it was, would lose one of its only competitive advantages by the potential revelation of documents Jawbone viewed as foundational to its future development plans.

### (v) The trade secret was related to or included in a product that is produced for or placed in interstate or foreign commerce

Jawbone was a leader in consumer technology and wearable devices that were sold worldwide. All of the alleged trade secrets related to products including speakers and fitness trackers, which were either in the domestic and foreign marketplace or were being developed for the market. Indeed, Trade Secret A, entitled "Audio Now" relates to research that Jawbone conducted related to the use of portable speakers, and Trade Secret B, entitled "Getting to Know the Chinese User and Their Shopping Journey" consists of a research study focused on how Chinese consumers shopped for fitness trackers.

## II. OTHER ISSUES

### A. Issues Identified in Prior Filings

The parties have each filed various Motions *In Limine* identifying evidentiary issues that are in dispute, principally revolving around the introduction of forensic evidence, evidence of the preceding civil litigations, and impermissible hearsay or opinion testimony. The government is filing its responses to the defendant's motions indicating, to the extent possible, where the claimed dispute is unfounded, either because the government does not intend to introduce the evidence the defendant is seeking to exclude or where the government disagrees with the defendant's basis to exclude.

The parties have identified multiple disputes in the jury instructions, most pressing being the

actual elements of the charged crime. The government respectfully requests that the Court also resolve this particular dispute prior to the commencement of trial, as the government is entitled to understand the full scope of its burden of proof prior to the introduction of its evidence in its case-in-chief.

The defendant has also filed a motion to dismiss the indictment, claiming grand jury misconduct. The United States will respond under separate cover to what it believes to be that wholly unsupported and unfounded motion on or before December 27, 2019, as ordered by the Court, for hearing on January 16, 2020.

### B. Sealing of Certain Trial Exhibits and Restricted Viewing in Courtroom

The United States requests that the Court enter an Order permitting the parties to place certain exhibits under seal following the trial, as well as to restrict the showing of certain exhibits to the public when the exhibits are published to the jury. To that end, the United States will seek a Trial Protective Order to supplement the existing Stipulated Interim Protective Order, entered by this Court on August 9, 2018, which has governed the parties in discovery pre-trial. [*See* Docket No. 28, p. 2 (stipulating the terms "will govern the designation and handling of material and other information produced by the United States during pretrial negotiations, while reserving the question of how such material and information should be handled at trial, and during pre- or post-trial hearings for a future time").]

While the public has a common law right to inspect and copy judicial records, that right is not absolute. *S.E.C. v. Van Waeyenberghe,* 990 F.2d. 845, 848 (5th Cir. 1993). "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Id.* (citing *Nixon v. Warner Commc'n Inc.*, 435 U.S. 589, 597 (1978).) These powers extend to situations where public disclosure has occurred through the admission of evidence at trial. *Nixon,* 435 U.S. at 598. Thus, the common law merely establishes a presumption of public access to judicial records, which can give way to other interests in a particular case. *Id.*

District courts have discretion to seal judicial records. *Id.* In exercising this discretion, "the court must balance the public's common law right of access against the interests favoring non-disclosure." *Id.* In applying this standard to a particular piece of information, courts should "consider the degree to which the subject matter is traditionally considered private rather than public." *United States v. Amodeo*,

71 F.3d 1044, 1051 (2d Cir. 1995). The nature and degree of any injury to the party seeking non-disclosure should also be weighed. *Id.* (noting that "[c]ommercial competitors seeking an advantage over rivals need not be indulged in the name of monitoring the courts"); *see also Apple Inc. v. Samsung Elecs. Co., Ltd.*, 727 F.3d 1214, 1221 (Fed. Cir. 2013) ("One factor that weighs in favor of sealing documents is when the release of the documents will cause competitive harm to a business.").

Under these standards, courts have recognized that judicial documents containing trade secrets should be sealed. *See In re Elec. Arts, Inc.,* 298 F. App'x 568, 569 (9th Cir. 2008) (district court abused its discretion in refusing to seal "pricing terms, royalty rates, and guaranteed minimum payment terms" found in a license agreement because such information "plainly falls within the definition of 'trade secrets.'"). Courts have reached the same conclusion with respect to a company's proprietary information and confidential information. *See Roundtree v. Chase Bank USA, N.A.*, No. C13-239-MJP, 2013 WL 6729582, at *2 (W.D. Wash. 2013) (sealing portion of summary judgment motion containing proprietary information); *Apple*, 727 F.3d at 1221 ("Considering the parties' strong interest in keeping their detailed financial information sealed and the public's relatively minimal interest in this particular information, we conclude that the district court abused its discretion in ordering the information unsealed."); *Mylan Inc. v. SmithKline Beecham Corp.,* 723 F.3d 413 415 n.3 (3d Cir. 2013) ("We are satisfied there is good cause to seal these records – i.e., to protect the parties' confidential proprietary business and competitive interests."); *Nixon,* 435 U.S. at 598 ("There is no indication of any improper purpose, and the public would ordinarily not have access to this information in the absence of this litigation.").

The relief that the United States seeks with a trial protective order will be limited. The United States will not seek to close certain portions of the trial or to exclude the public from attending and observing the trial. Rather, the United States will seek to place under seal a limited number of proprietary and confidential Jawbone documents that – while Jawbone as the original owner of these documents is no longer an existing business, and a successor-in-interest to these documents might view them as fungible – they are of even less of interest, if any, to the general public. The sealing of these documents will not impair the public's ability to scrutinize the trial because the trial proceedings are open to the public, the transcript of the entire proceedings will be publicly available, and many of the

exhibits will be public as well. At the same time, the documents at issue, in the hands of Jawbone's former competitors, customers, and business associates would cause significant competitive harm. As the Ninth Circuit has observed, "compelling reasons sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such court files might have become a vehicle for improper purposes." *Kamakana v. City and County of Honolulu,* 447 F.3d 1172, 1179 (9th Cir. 2006).

Failing to maintain the confidentiality of victims' proprietary and financial information in EEA cases would severely limit the government's ability to use the assistance of people willing to cooperate to catch and convict thieves of trade secrets, and thereby undermine the public interest in prosecuting such criminals. While passing the EEA, Congress recognized the importance of maintaining the confidentiality of trade secrets during litigation involving trade secrets to effective enforcement of the statute. *See* H.R. Rep. No. 104-788 at 13 (Judiciary Committee) ("The intent of this section is to preserve the confidential nature of the information and, hence, its value. Without such a provision, owners may be reluctant to cooperate in prosecutions for fear of further exposing their trade secrets to the public view, thus further devaluing or even destroying their worth"); *see also,* S. Rep. 104-359 at 17. Specifically, under Section 1835 of the EEA, Congress mandated the Court to "enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets."

The United States will confer with the defendant's counsel to determine if the parties can come to an agreement on a trial protective order that the Court can enter which will designate specific documents to be sealed by the Court upon the conclusion of the matter and protected from public view during publication to the jury.

### III. CONCLUSION

The United States continues to estimate that its case-in-chief (following jury selection) will last approximately five (5) court days. At the Pretrial Conference the undersigned will be prepared to address any other procedural, factual, or legal issues of interest to the Court.

DATED: December 13, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____
AMIE D. ROONEY
SUSAN F. KNIGHT
Assistant United States Attorneys